[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 14, 2004
THOMAS K. KAHN
CLERK**

No. 03-10172

_____

D. C. Docket No. 00-07558 CV-KAM

SANDRA JACKSON,
LINDEN ADAMS, *et al.,*

Plaintiffs-Appellants,

versus

BELLSOUTH TELECOMMUNICATIONS, a Georgia corporation
licensed to do business in the State of Florida,d.b.a. BellSouth,
FRANCIS B. SEMMES, individually and as attorney for
BellSouth, *et al.*,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(June 14, 2004)**

Before TJOFLAT and MARCUS, Circuit Judges, and MUSGRAVE[*], Judge.

_____

[*]Honorable R. Kenton Musgrave, Judge, United States Court of International Trade,
sitting by designation.

MARCUS, Circuit Judge:

In this appeal, Sandra Jackson and fifty other appellants challenge the dismissal of their lawsuit against BellSouth Telecommunications ("BellSouth"), and Sarah Jones appeals the district court's entry of summary judgment in favor of the law firm Ruden, McClosky, Smith, Schuster & Russell, P.A. ("Ruden McClosky"). Jackson, Jones, and fifty-two other plaintiffs sued BellSouth and Ruden McClosky, among others, alleging misconduct arising out of the settlement of a prior employment discrimination lawsuit against BellSouth. According to the plaintiffs, during the course of settling the earlier case, BellSouth and Ruden McClosky engaged in a wide variety of misconduct, including violating the federal and state RICO statutes, intentionally discriminating in violation of 42 U.S.C. § 1981, and engaging in various common law torts. After thorough review, we are persuaded by none of the plaintiffs' arguments, and, accordingly, affirm in all respects the judgments of the district court.

**I.**

The background facts and procedural history necessary to understand this case are intricate and extensive.[1] This lawsuit stemmed from the settlement of a

---

[1]Portions of the factual and procedural background of this case are set forth in three Orders entered by the district court in this case. See Jackson v. BellSouth Telecomm., Inc., 181 F. Supp. 2d 1345, 1350-53 (S.D. Fla. 2001) (hereinafter "Jackson I"); Jackson v. BellSouth

case originally brought by fifty-six plaintiffs[2] in 1996 in the Southern District of

Florida, entitled <u>Adams v. BellSouth Telecommunications, Inc.</u>, Case No. 96-

2473-Civ-MIDDLEBROOKS (hereinafter "the <u>Adams</u> case" or "<u>Adams</u>").[3]  The

<u>Adams</u> case was essentially a group employment discrimination action brought by

many African-American employees of BellSouth and by several applicants seeking

employment.

Most of the fifty-two appellants in this matter were formerly plaintiffs in the

<u>Adams</u> case, or were putative plaintiffs in a companion suit entitled <u>Andrews v.</u>

<u>BellSouth</u> ("<u>Andrews</u>") that was never filed but was settled contemporaneously

---

Telecomm., Inc., Order on BellSouth Defendants' Motion to Dismiss at 1-4, No.00-7558-Civ-MIDDLEBROOKS (S.D. Fla. June 3, 2002) (hereinafter "<u>Jackson II</u>"); <u>Jackson v. BellSouth Telecomm., Inc.</u>, Order Granting Summary Judgment as to All Claims of Plaintiff Sarah Jones at 1-3, No. 00-7558-Civ-MARRA (S.D. Fla. Nov. 26, 2002).

[2] The plaintiffs in the original <u>Adams</u> lawsuit were Linden Adams, Virginia Adams, Texella Adams, Darlene Baker, Raphael Baptiste, Doris Benjamin, Linda Boatwright, Beverly Britt, Vivian Britt, Willa Brown, Garriet Carter, Canta Chestnut, Kenneth Covin, Eileen Davidson, Monique Daughtry, Tracy Davis, Shekina Donaldson-Del Mar, Jessie Dyett, Mary Edmond, Teresa Facyson, Alice Fields, Windell Foote, John Fuller, Jan Harris, Afran Hamin, Juanita Jackson, Sandra Jackson, John Johnson, Lynda Johnson, Vicky Jones, Edith Kelson, James Latham, Laura Lucas, Yvonne Marsh, Betty Merricks, Cynthia Mincey, Olga Moore, Brenda Oliver, Theresa Patterson, James Rachel, Linda Radford, Jacqueline Rhaheed, Sharwyn Rhyant-Noble, James Robinson, Teresa Robinson, Derrick Smart, Arfonzo Smith, Bernette Snead, Willie Stovall, Prudence Taylor, Robbie Watson, Shirley Washington, Joseph Williams, Monica Williams, Ann Wofford, and Pauline Wright.

[3]Prior to the <u>Adams</u> case, the plaintiffs' attorney, Norman Ganz, had filed a previous action styled <u>Adams v. BellSouth</u>, No. 95-6895-Civ-ZLOCH, which was dismissed based on the parties' stipulation after the district court denied a joint motion for extension of time to complete discovery.  Ganz filed the <u>Adams</u> case thereafter.

3

with the resolution of the <u>Adams</u> case ("the <u>Adams</u> settlement").[4]   After filing the <u>Adams</u> case, attorney Norman Ganz solicited the additional plaintiffs listed in the <u>Andrews</u> complaint, and threatened BellSouth with still more litigation and negative publicity that would accompany filing the <u>Andrews</u> charges.  Faced with the threat of protracted litigation and the concomitant bad press that would follow in its wake, BellSouth reached a comprehensive settlement agreement with most of

---

[4]The appellants in this case are Sandra Jackson and Linden Adams, Virginia Adams, Sheila Andrews, the Estate of Darlene Baker, Kyra Baptiste, Raphael Baptiste, Doris Benjamin, Linda Boatwright, Kevin Boothe, Willa Brown, Garriett Carter, Canta Chestnut, Kenneth Covin, Eileen Davidson, Tracy Davis, Jessie Dyett, Teresa Facyson, Alice Fields, Windell Foote, Carl Forbes, John Fuller, Jacqueline Fuller-Rhaheed, John Johnson, Lynda Johnson, Sarah Jones, Edith Kelson, Melvin Kendrick, James Latham, Shedrick Little, Laura Lucas, Donald McGuckian, Cynthia Mincey, Teresa Patterson, James Rachel, Linda Radford, Sharwyn Rhyant-Noble, James Robinson, James Scott, Derrick Smart, Arfonzo Smith, Bernette Snead, Douglas Stanton, Lorenzo Stewart,  Prudence Taylor, Shirley Washington, Joseph Williams, Zadie Wimberly, Ivory Young, Jacqueline Young, Vicky Young, and Lydia Youngs.  Two plaintiffs in this case, Juanita Jackson and Willie Stovall, are not parties to this appeal.

The appellants in this case who were plaintiffs in the underlying <u>Adams</u> lawsuit are Linden Adams, Virginia Adams, the Estate of Darlene Baker, Raphael Baptiste, Doris Benjamin, Linda Boatwright, Willa Brown, Garriet Carter, Canta Chestnut, Kenneth Covin, Eileen Davidson, Tracy Davis, Jessie Dyett, Teresa Facyson, Alice Fields, Windell Foote, John Fuller, Jacqueline Fuller-Rhaheed, Sandra Jackson, John Johnson, Lynda Johnson, Edith Kelson, James Latham, Laura Lucas, Cynthia Mincey, Theresa Patterson, James Rachel, Linda Radford, Sharwyn Rhyant-Noble, James Robinson, Derrick Smart, Arfonzo Smith, Bernette Snead, Prudence Taylor, Shirley Washington, Joseph Williams, and Vicky Young.

 The appellants in this case who were putative plaintiffs in the unfiled <u>Andrews</u> complaint are Sheila Andrews, Kyra Baptiste, Kevin Boothe, Carl Forbes, Melvin Kendrick, Shedrick Little, Donald McGuckian, James Scott, Douglas Stanton, Lorenzo Stewart, Zadie Wimberly, Ivory Young, Jacqueline Young, and Lydia Youngs.

Appellant Sarah Jones was neither a plaintiff in the underlying <u>Adams</u> lawsuit nor a putative plaintiff in the <u>Andrews</u> complaint.

the Adams plaintiffs and putative plaintiffs from Andrews. These individuals make up the bulk of the appellants in this case, and are joined by three others who were not parties to the Adams settlement, but who assert that the Adams settlement foreclosed their claims against BellSouth.[5]

The defendants in this case include BellSouth and two BellSouth attorneys who handled the Adams litigation, Francis Semmes and Keith Kochler (collectively "the BellSouth defendants"). The BellSouth defendants are joined as co-defendants by Ruden McClosky, the law firm that represented the plaintiffs in the original Adams litigation, and by Barry A. Mandelkorn, a Ruden McClosky attorney who oversaw the Adams litigation (collectively "the Ruden McClosky defendants"). All of the appellants other than Sarah Jones appeal from the dismissal of their claims against BellSouth.[6] Because the other appellants reached a settlement with Ruden McClosky, Sarah Jones is the only party who appeals the district court's grant of summary judgment in favor of the law firm. Two additional defendants, attorney Norman Ganz and paralegal Brian Neiman, were voluntarily dismissed by the plaintiffs.

---

[5]Originally, there were four plaintiffs in this case who did not participate in the global Adams settlement: Kenneth Covin, Juanita Jackson, Sarah Jones, and Zadie Wimberly. Jackson voluntarily dismissed her claims, and is not a party to this appeal.

[6]Donald McGuckian, who is white, joins the appeal from the dismissal of all claims against BellSouth, excluding the § 1981 race discrimination claim.

In two separate Orders, the district court dismissed all of the plaintiffs' claims against BellSouth. See Jackson v. BellSouth Telecomm., Inc., 181 F. Supp. 2d 1345 (S.D. Fla. 2001) ("Jackson I"); Jackson v. BellSouth Telecomm., Inc., Order on BellSouth Defendants' Motion to Dismiss, No.00-7558-Civ-MIDDLEBROOKS (S.D. Fla. June 3, 2002) ("Jackson II"). Subsequently, Ruden McClosky settled with the great majority of the plaintiffs; Sarah Jones pressed on with her claims against the law firm. The district court eventually granted summary judgment in favor of Ruden McClosky on all of Jones's claims. See Jackson v. BellSouth Telecomm., Inc., Order Granting Summary Judgment as to All Claims of Plaintiff Sarah Jones, No.00-7558-Civ-MARRA (S.D. Fla. Nov. 26, 2002) ("Jackson III").

In this appeal, the appellants challenge the dismissal of their claims against BellSouth and Jones challenges the entry of summary judgment in favor of Ruden McClosky.[7] First, appellants say that the district court erred in dismissing their

_____

[7] The appellants are represented by different counsel in this appeal. Hatch & Doty, P.A. ("Hatch") represent Sandra Jackson and Sheila Andrews, Kevin Boothe, Willa Brown, Teresa Facyson, Sarah Jones, Edith Kelson, Melvin Kendrick, Zadie Wimberly, Vicky Young, and Lydia Youngs. The remaining 41 appellants are represented by Becker & Poliakoff, P.A. ("B&P"). Aside from the arguments Hatch makes concerning Jones alone, most of the arguments raised by Hatch and B&P are similar. All of the appellants besides Jones join the appeal from the dismissal of their claims against BellSouth. Donald McGuckian joins the appeal from the dismissal of the claims against BellSouth, except for the dismissal of the § 1981 race discrimination claims.

6

federal and state RICO claims for failing to sufficiently allege a pattern of racketeering, and in dismissing their RICO conspiracy claims as well. Similarly, they claim that the district court erred in dismissing their intentional discrimination claims (brought pursuant to 42 U.S.C. § 1981) for failure to state a claim. Finally, appellants urge that the trial court erred in finding their state common law claims barred by Florida's litigation privilege and in concluding that the general releases they signed barred the instant litigation. Appellant Jones, in turn, argues that the entry of summary judgment for Ruden McClosky was error because she actually raised a genuine issue of material fact as to whether the law firm represented her.

A.

The plaintiffs in the <u>Adams</u> case were originally represented by the Law Office of Norman Ganz, where the matter was overseen by Norman Ganz and his paralegal, Brian Neiman. The Ganz firm solicited clients to mount a race discrimination lawsuit against BellSouth by placing advertisements in local newspapers in Fort Pierce and Palm Beach County, Florida, and by asking the BellSouth employees who responded to solicit additional plaintiffs among their co-workers. After filing the <u>Adams</u> lawsuit, Ganz continued to solicit still more putative claimants who said they were the victims of BellSouth's discriminatory

7

employment practices; twenty-two additional plaintiffs were listed in a second complaint entitled Andrews v. BellSouth.[8]  Ganz never filed the second complaint, but, as noted, he did threaten BellSouth with the prospect of ongoing and protracted litigation through the addition of new plaintiffs and the filing of more suits.

Shortly after Ganz filed the Adams lawsuit, he contacted attorney Barry A. Mandelkorn, a lawyer with Ruden McClosky, and asked Mandelkorn to assist him with the Adams litigation.  In March 1997, Mandelkorn agreed to serve as trial co-counsel based on the terms of a "Fee and Workshare Agreement."  This agreement specifically delineated which Ganz clients Ruden McClosky would represent and which ones it would not.  It also provided that Ganz would be responsible for disclosing the arrangement between Ganz and Mandelkorn to all of the plaintiffs. In subsequent correspondence, the Ruden McClosky defendants took pains to distinguish between those plaintiffs who had asserted claims against BellSouth -- thus becoming Ruden McClosky clients -- and those individuals who had not asserted claims against BellSouth -- and therefore were not Ruden McClosky

_____

[8]The Andrews complaint listed the following twenty-two plaintiffs: Sheila Andrews, Rhonda Arnett, Kyra Baptiste, Stan Barnett, Kevin Boothe, Carl Forbes, Florida Green, Ronald Jackson,  Melvin Kendrick, Shedrick Little, Donald McGuckian, Rittie Ragland, James Scott, Wanda Spain, Douglas Stanton, Lorenzo Stewart, Robert Taylor, Eliot Williams, Zadie Wimberly, Ivory Young, Jacqueline Young, and Lydia Youngs.

clients.  Indeed, in correspondence with BellSouth, Ruden McClosky periodically referenced these "unfiled claims," noting that they were exclusively the clients of Ganz.

In August 1997, Ruden McClosky and the BellSouth defendants negotiated and consummated a global settlement of the Adams litigation which covered the claims of the plaintiffs in Adams and the putative plaintiffs in Andrews.  Notably, none of the settlement correspondence mentioned Sarah Jones by name, despite the fact that the documents named all of the Adams plaintiffs as well as the "unfiled claims" exclusively represented by Ganz.  Jones was not a party to the Adams litigation, was not listed as a plaintiff in the Andrews complaint, and never executed a formal retainer with Ruden McClosky.  Jones, however, claims that a lawyer-client relationship with Ruden McClosky developed based on a number of conversations she had with individuals who worked at the Ganz law firm.

The global settlement reached in August 1997 contained a number of very unusual provisions which raised serious ethical issues and eventually resulted in the district court referring the Ruden McClosky defendants, Norman Ganz, and paralegal Brian Neiman to the Florida Bar Association for investigation into possible disciplinary action; to the Grievance Committee of the Southern District of Florida for review of attorney misconduct; and to the United States Attorney for

the Southern District of Florida.[9]  The settlement provided for BellSouth to pay

$1,600,000.00, an amount the plaintiffs allege was far below the fair value of their

original claims. Moreover, after the plaintiffs' attorneys deducted their fees and

the fees associated with a consulting agreement, described infra, the plaintiffs

themselves received only approximately $300,000 of the $1.6 million dollar

settlement.[10]   The individual plaintiffs took payments ranging from $500.00 to

$79,000.00, with only one plaintiff receiving $79,000.00 and more than half of the

plaintiffs receiving $5,000.00 or less from the settlement.

At the time of the global settlement, each plaintiff was directed to appear at

the offices of Ruden McClosky, where they received a check for their portion of

_____

[9]After initially ceasing the practice of law in 1998, see The Florida Bar v. Ganz, 722 So. 2d 194 (Fla. 1998) (Table), Ganz was disbarred by the Florida Supreme Court in 2002.  See The Florida Bar v. Ganz, 831 So. 2d 673 (Fla. 2002) (Table).  Ruden McClosky and Barry Mandelkorn entered into a consent agreement  negotiated to settle the district court's inquiry into the ethical violations alleged as part of the Adams settlement.  The terms of this agreement were adopted by the district court on January 29, 2001.  See Adams v. BellSouth Telecomm., Inc, Omnibus Order on Magistrate's Reports and Recommendations, No. 96-2473-Civ-MIDDLEBROOKS (S. D. Fla. Jan 29, 2001) ("Adams Omnibus Order") (adopting Adams v. BellSouth Telecomm., Inc., Consent Report and Recommendation Concerning Ruden McClosky and Mandelkorn, No. 96-2473-Civ-MIDDLEBROOKS (S. D. Fla. August 31, 2000)).  The agreement provided that Mandelkorn would participate in continuing education and perform pro bono legal services, and that Ruden McClosky would disgorge $120,000 allocated to it under the BellSouth settlement.  In addition, Ruden McClosky agreed to make available to its former clients an additional $130,000, on the condition that any person taking a share of this additional sum released Ruden McClosky and Mandelkorn from further litigation.

[10]Counsel for the plaintiffs claimed fees of over $850,000.00, and charged the individual plaintiffs costs of $100,000.00, as well as "contractual engagement fees" of $230,000.00 and "fees for non-economic benefits" of $51,500.00.  Additionally, plaintiffs' counsel claimed "post-settlement consulting fees" of $120,000.00.

the settlement funds. Before distributing each of the individual payments, Mandelkorn told the plaintiffs that the total value of the settlement could not be disclosed, and also required each plaintiff to sign a "general release" of all claims against BellSouth. One term of the release expressly prohibited each plaintiff from discussing how much he or she received under the agreement, and warned that any breach of this confidentiality provision would result in the termination of his or her employment at BellSouth. See Jackson I, 181 F. Supp. 2d at 1352-53.

The settlement also contained two separate agreements which the plaintiffs describe as unlawful and unethical. First, the plaintiffs' lawyers agreed not to sue BellSouth on any employment discrimination claim for a period of one year.[11]

---

[11]Before agreeing to include this one-year practice restriction provision in the settlement agreement, BellSouth, headquartered in Georgia, obtained guidance from Florida counsel regarding the enforceability of the restriction. BellSouth maintains that it relied on an opinion from Florida counsel that the practice restriction was permissible and believed in good faith that the restriction was not improper under Lee v. Fla. Dep't of Ins. and Treasurer, 586 So. 2d 1185 (Fla. Dist. Ct. App. 1991) (holding that it is error to use an ethical rule as a basis to invalidate or render void a provision in a private contract between two parties).

On this record, there is some uncertainty regarding the advice on which BellSouth relied. BellSouth retained Valerie Shea, of Heinrich Gordon Hargrove Weihe James, PA, as local counsel, and Shea produced a memorandum addressing the legal enforceability of the practice restriction. See Adams Omnibus Order at 7-8; see also Jackson v. BellSouth Telecomm., Inc., Plaintiffs' Civil RICO Case Statement Directed to the Fourth Amended Complaint, No. 00-7558-Civ-MIDDLEBROOKS (S. D. Fla. Feb. 28, 2002). However, Shea's memorandum did not address in detail the ethical propriety of the proposed agreement. Adams Omnibus Order at 8. In a March 24, 1997 letter from Francis Semmes of BellSouth to Barry Mandelkorn, Semmes wrote that "Mr. Neiman has stated that such [a practice restriction] agreement is proper and enforceable in the State of Florida." Because Mr. Neiman was a paralegal, and not authorized to practice law, it was not appropriate for BellSouth to rely on his representations without obtaining further advice from Shea or other counsel, or at the very least, conducting an independent inquiry.

11

Second, BellSouth and Ruden McClosky entered into a four-year "consulting

agreement" by which $120,000 of the settlement fund was paid directly to Ruden

McClosky.[12]  The plaintiffs say that this agreement was negotiated to create a

_____

(Neiman was eventually enjoined from engaging in the unauthorized practice of law, and pleaded nolo contendere to various misdemeanor counts arising out of the unauthorized practice of law. See The Florida Bar v. Neiman, 816 So. 2d 587 (Fla. 2002)).

BellSouth also maintains that at the time it agreed to the practice restriction, such agreements were permissible under the ethical rules of Georgia.  Indeed, Rule 2-108 of Georgia's Code of Professional Responsibility, entitled "Agreements Restricting the Practice of a Lawyer," does appear to have allowed for a limited practice restriction, as it includes language stating that, "in connection with the settlement of a controversy or suit," a lawyer "may enter into an agreement not to accept any other representation arising out of a transaction or event embraced in the subject matter of the controversy or suit thus settled." Georgia Code of Prof. Resp. DR 2-108(B).  We note, however, that this rule was reserved as of January 1, 2001, and that Georgia Rule of Professional Conduct 5.6, adopted effective on that date -- after the events in question -- states that a lawyer "shall not participate in offering or making: . . . (b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties."  As Rule 5.6 suggests,  today Georgia apparently prohibits practice restriction agreements.

Regardless of the parameters of the Georgia Rule, it is clear that if counsel for BellSouth had conducted more than the most cursory research into the Florida ethics rules, the impropriety of the practice restriction would have been apparent.  Florida Rule 4-5.6, entitled "Restrictions on Right to Practice" provides that a lawyer "shall not participate in offering or making: . . . (b) [a]n agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties."  If the meaning of Florida's rule were not apparent from its plain language, the comment to that rule explains that "[s]ubdivision (b) prohibits a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client."  Moreover, Florida's rule is identical to the ABA's Model Rule 5.6, the commentary to which states unambiguously that "it has been deemed unethical and impermissibly restrictive of a lawyer's right to practice for a lawyer to offer, or enter, an agreement settling a client's case if the agreement includes a restriction on the lawyer's ability to represent other plaintiffs against the same defendant." ABA Model Rule 5.6(b), comment (emphasis added). Thus, had BellSouth not relied on Mr. Neiman's advice, and had they undertaken a more thorough inquiry, they would have realized that the practice restriction violated Florida's ethics rules.

[12]As we have noted, Ruden McClosky eventually agreed to disgorge this entire $120,000.00 sum, as part of an agreement negotiated to settle the district court's inquiry into the

conflict of interest that would prevent Ruden McClosky from representing any future plaintiffs against BellSouth, effectively buying the loyalty of the plaintiffs' attorneys from the plaintiffs. See Jackson I, 181 F. Supp. 2d at 1352-53.

Not surprisingly, because of the substantial ethical irregularities associated with the settlement, the district court eventually ruled that the individual plaintiffs were entitled to set aside the global agreement and prosecute their original claims. See Jackson I, 181 F. Supp. 2d at 1350. In doing so, the court expressly conditioned the right to set aside the settlement and its waiver of the right to sue on the disgorgement of all benefits received or to be received under the settlement. Id. The district court reasoned that equity compelled the plaintiffs to forego the benefits they had received from the putative settlement if they intended to challenge the fairness of its terms. To date, none of those who received funds from the settlement has disgorged any of the proceeds they received; rather, they maintain that the waivers they signed during the global Adams settlement cannot be given any legal effect, and that their right to bring the current action has not been waived.

---

ethical violations alleged as part of the Adams settlement. The terms of this agreement were adopted by the district court in Adams on January 29, 2001. See Adams Omnibus Order at 26-27.

B.

The plaintiffs commenced this action on October 20, 2000, asserting claims for violations of 42 U.S.C. § 1981 (race discrimination), 18 U.S.C. §§ 1961-1962 (RICO), and 18 U.S.C. §§ 1341-1343 (mail and wire fraud), as well as state law claims for misrepresentation, negligent misrepresentation, breach of fiduciary duty, conversion, negligent retention, training and supervision, and intentional infliction of emotional distress. Plaintiffs amended their original complaint as of right and filed an Amended Complaint on October 31, 2000. In essence, the Amended Complaint repeated the charges contained in the first complaint, claiming that in the course of settling the Adams litigation, the BellSouth and Ruden McClosky defendants had conspired to defraud them and intentionally discriminated against them on the basis of race, and that the Ruden McClosky defendants had breached various duties owed to them and committed legal malpractice.

In January 2001, the BellSouth and Ruden McClosky defendants each moved separately to dismiss the Amended Complaint. Instead of responding to the motions to dismiss, plaintiffs moved for leave to file a Second Amended Complaint on February 1, 2001. Soon thereafter leave was granted to file a Second Amended Complaint. It contained six counts against the various

defendants, including: (1) violation of 42 U.S.C. § 1981; (2) violation of 18 U.S.C. §§ 1961-1962 (RICO); (3) misrepresentation/fraud in the inducement; (4) malpractice; (5) breach of fiduciary duty; and (6) conversion. See Jackson I, 181 F. Supp. 2d at 1351.

On March 23, 2001, the BellSouth defendants moved to dismiss the Second Amended complaint; the Ruden McClosky defendants followed suit on April 12, 2001. Instead of responding to these motions, the plaintiffs still again sought leave to amend their complaint. Again, the district court granted leave to amend, but warned the plaintiffs this time that "[a]ny claim asserted in any of the prior three complaints, that has been reasserted in the third amended complaint and attacked by pre- or post-answer motion to dismiss, will be subject to dismissal with prejudice." Jackson I, 181 F. Supp. 2d at 1351 (quoting original order) (emphasis in original). The plaintiffs filed their Third Amended Complaint on May 18, 2001.

The Third Amended Complaint included claims against both the BellSouth and Ruden McClosky defendants for (1) racial discrimination in violation of 42 U.S.C. § 1981 (Count I);[13] (2) three federal RICO violations under 18 U.S.C. § 1962(b), (c), and (d), and three Florida RICO counts under Fla. Stat. Ch.

---

[13]Plaintiff Donald McGuckian did not join the § 1981 race discrimination claim.

15

772.103(2), (3), and (4) (Counts II through VII); and conspiracy to defraud (Count IX). The Third Amended Complaint also contained a claim against the BellSouth defendants for tortious interference with advantageous contractual and business relationships (Count XV), and claims against the Ruden McClosky defendants alone for fraud in the inducement (Claim VIII); breach of contract (Count X); breach of implied duties of good faith and fair dealing (Count XI); breach of fiduciary duty (County XII); legal malpractice (Count XIII); and conversion (Count XIV).

On June 5, 2001, the BellSouth defendants moved to dismiss the entire Third Amended Complaint, and on June 14, the Ruden McClosky defendants moved to dismiss Counts I through IX of the Third Amended Complaint. The Ruden McClosky defendants did not seek to dismiss the supplemental state-law claims asserted against them in Counts X through XIV, choosing instead to answer these counts.

The district court took oral argument on the motions on September 5, 2001, and soon thereafter, dismissed without prejudice the § 1981 claim against the BellSouth defendants, and dismissed with prejudice the remaining counts asserted against BellSouth. See Jackson I, 181 F. Supp. 2d at 1365. The plaintiffs subsequently filed a Fourth Amended Complaint which realleged a single claim

under § 1981 against the BellSouth defendants. The BellSouth defendants moved to dismiss this claim too, and on June 3, 2002, the court dismissed with prejudice the last remaining claim against BellSouth. See Jackson II at 15.

The district court's response to the Ruden McClosky defendants' motion to dismiss the plaintiffs' Third Amended Complaint, however, was mixed. The court denied the motion as to the § 1981 claim and the fraud in the inducement and conspiracy to defraud charges, but dismissed with prejudice the plaintiffs' federal and state RICO claims against the Ruden McClosky defendants. The Fourth Amended Complaint repeated the same charges the plaintiffs had made against Ruden McClosky in the Third Amended Complaint. Subsequent to its filing, the Ruden McClosky defendants reached a settlement with all of the appellants other than Sarah Jones.

Having failed to settle with Ruden McClosky, Sarah Jones pressed forward with claims against the Ruden McClosky defendants, alleging violations of § 1981, breach of contract, breach of fiduciary duty, and legal malpractice. Discovery went forward and on September 30, 2002, the Ruden McClosky defendants moved for summary judgment against Jones on all counts. On

November 26, 2002, the district court[14] granted the Ruden McClosky defendants' motion for summary judgment as to Jones's § 1981 claim and as to her remaining claims, which the court reasoned were all, at their core, in the nature of a claim for legal malpractice. See Jackson III at 6-7.

C.

In this appeal, Sarah Jones challenges the district court's entry of summary judgment in favor of the defendants on her legal malpractice, breach of contract, and breach of fiduciary duty claims against the Ruden McClosky defendants.[15] The appellants, other than Jones, challenge the district court's dismissal of their claims against the BellSouth defendants, including their claims brought under the federal and state RICO statutes, and claims for conspiracy to defraud and tortious interference with advantageous business relationships. The appellants, other than Jones and McGuckian, also appeal from the district court's dismissal of their § 1981 racial discrimination claims against BellSouth. We turn, first, to the plaintiffs' appeal from the district court's dismissal of their claims against

---

[14]Initially, this case was heard by United States District Judge Donald M. Middlebrooks, who issued the Orders dismissing the claims against BellSouth defendants, Jackson I and Jackson II. On September 27, 2002, the case was reassigned to United States District Judge Kenneth A. Marra, who issued the Order granting final summary judgment in favor of the Ruden McClosky defendants, Jackson III.

[15]Jones does not appeal the district court's entry of summary judgment in favor of Ruden McClosky on her § 1981 claim.

BellSouth, and then to Jones's appeal from the district court's entry of summary judgment in favor of the Ruden McClosky defendants.

## II.

We review de novo a district court's dismissal under Rule 12(b)(6) for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam); see also Jackson v. Birmingham Bd. of Educ., 309 F.3d 1333, 1335 (11th Cir. 2002) (citing Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the facts stated in appellant's complaint and all reasonable inferences therefrom are taken as true.").  A motion to dismiss is granted only "when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Jackson, 309 F.3d at 1335 (quoting Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957))).

"Although a plaintiff is not held to a very high standard in a motion to dismiss for failure to state a claim, some minimal pleading standard does exist." Wagner v. Daewoo Heavy Industries Am. Corp., 289 F.3d 1268, 1270 (11th Cir.),

rev'd on other grounds, 314 F.3d 541 (11th Cir. 2002) (en banc). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002) (internal quotation marks and citation omitted); see also Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974) ("Conclusory allegations and unwarranted deductions of fact are not admitted as true . . . .")[16]; Robinson v. Jewish Ctr. Towers, Inc., 993 F. Supp. 1475, 1476 (M.D. Fla. 1998) ("[T]he court will not accept, without more, conclusory allegations or legal conclusions masquerading as factual conclusions."); Cummings v. Palm Beach County, 642 F. Supp. 248, 249-50 (S.D. Fla. 1986) (finding vague and conclusory complaint failed to state a factual basis for claims of race and age discrimination required to give defendant notice necessary to prepare defense). To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims.

---

[16]Fifth Circuit decisions rendered prior to September 30, 1981 are binding precedent on this Court. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

20

A.

*Plaintiffs' Substantive Federal and State RICO Claims*

The plaintiffs raise two basic questions on appeal: first, whether the district court erred in concluding that the plaintiffs failed to allege a pattern of racketeering activity by failing to establish "continuity"; and second, whether the district court likewise erred in finding that the plaintiffs failed to allege a conspiracy claim under either the federal or state RICO statutes. We address them in turn.

The plaintiffs' RICO claims were laid out in Counts II through VII of their Third Amended Complaint, and were dismissed as to the BellSouth defendants in the district court's order entered September 17, 2001. Jackson I, 181 F. Supp. 2d at 1365. The plaintiffs alleged violations of the federal RICO statute, 18 U.S.C. § 1962(b)-(d), and Florida's RICO analog, the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.103(2)-(4).[17] We have explained that interpretation

_____

[17]The relevant portion of the federal RICO statute reads as follows:

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

of Florida's RICO law "is informed by case law interpreting the federal RICO

---

> interstate or foreign commerce, to conduct or participate, directly
> or indirectly, in the conduct of such enterprise's affairs through a
> pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of
> the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(b)-(d).

The pertinent portion of the Florida RICO statute provides that "It is unlawful for any person:"

> . . . .
>
> (2) Through a pattern of criminal activity or through the collection
> of an unlawful debt, to acquire or maintain, directly or indirectly,
> any interest in or control of any enterprise or real property.
>
> (3) Employed by, or associated with, any enterprise to conduct or
> participate, directly or indirectly, in such enterprise through a
> pattern of criminal activity or the collection of an unlawful debt.
>
> (4) To conspire or endeavor to violate any of the provisions of
> subsection (1), subsection (2), or subsection (3).

Fla. Stat. § 772.103 (2) - (4).

Under Florida law, a "pattern of criminal activity"

> means engaging in at least two incidents of criminal activity that
> have the same or similar intents, results, accomplices, victims, or
> methods of commission or that otherwise are interrelated by
> distinguishing characteristics and are not isolated incidents;
> provided that the last of such incidents occurred within 5 years
> after a prior incident of criminal activity. For the purposes of this
> chapter, the term "pattern of criminal activity" shall not include
> two or more incidents of fraudulent conduct arising out of a single
> contract or transaction against one or more related persons.

Fla. Stat. § 772.102(4).

22

statute . . . on which Chapter 772 is patterned." Jones v. Childers, 18 F.3d 899, 910 (11th Cir. 1994) (internal citation omitted). Because "Florida courts often look to the Federal RICO decisions for guidance in interpreting and applying the act[,]" Fla. Software Sys., Inc. v. Columbia/HCA Healthcare Corp., 46 F. Supp. 2d 1276, 1284 (M.D. Fla. 1999), the analysis we apply to the plaintiffs' federal RICO claims is equally applicable to their state RICO claims. See All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc., 135 F.3d 740, 745 (11th Cir. 1998) ("Florida's RICO statutes have consistently been interpreted using federal RICO claim cases.").

Essential to any successful RICO claim are the basic requirements of establishing a RICO enterprise and a "pattern of racketeering activity." A RICO enterprise exists "where a group of persons associates, formally or informally, with the purpose of conducting illegal activity." United States v. Hewes, 729 F.2d 1302, 1311 (11th Cir. 1984).[18] To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a

_____

[18]A RICO enterprise may include any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

23

continuing nature. See 18 U.S.C. § 1961(5); H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239-43, 109 S. Ct. 2893, 2900-2903, 106 L. Ed. 2d 195 (1989); Childers, 18 F.3d at 910-13; see also State v. Lucas, 600 So. 2d 1093, 1094 (Fla. 1992) (adopting the criteria set forth in H.J. Inc.).

It is by now well established that in order to prove a "pattern of racketeering activity" it is not sufficient to simply establish two isolated predicate acts. RICO targets ongoing criminal activity, rather than sporadic, isolated criminal acts, a principle that was stressed in an American Bar Association study which explained that "[t]he 'pattern' element of the [RICO] statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes." Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 72 (1985). As the Supreme Court has explained,

> while two acts are necessary, they may not be sufficient. Indeed, in common parlance, two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern." S. Rep. No. 91-617, p. 158 (1969) (emphasis added). . . . Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening:

24

> "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e).

Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 n.14, 105 S. Ct. 3275, 3285 n.14, 87 L. Ed. 2d 346 (1985).

Four years after it had decided Sedima, the Supreme Court further explicated the concept of "continuity plus relationship" it outlined in Sedima. In H.J Inc., the Court observed that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." 492 U.S. at 239, 109 S. Ct. at 2900 (second emphasis added). This Circuit has held that "'a 'pattern of racketeering' activity requires proof of something beyond the two predicate acts themselves.' That something is the threat of continuing racketeering activity." Childers, 18 F.3d at 912 (emphasis added) (quoting United States v. Gonzalez, 921 F.2d 1530, 1545 (11th Cir. 1991)). The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address -- one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into

25

the future.  In this case, the district court concluded (and the plaintiffs challenge only the conclusion) that the allegations failed to satisfy the <u>continuity</u> requirement of a pattern of racketeering activity.  The district court did not find that the claim failed to plead the requisite predicate acts, nor did it reach the issue of whether the predicate acts were sufficiently related.  See <u>Jackson I</u>, 181 F. Supp. 2d at 1358 & 1358 n.12.  We examine, then, only whether the district court correctly concluded that the acts alleged failed to satisfy the <u>continuity</u> element.

In explaining RICO's continuity requirement, the Supreme Court  has said this:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . . A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. . . . Often a RICO action will be brought before continuity can be established in this way.  In such cases, liability depends on whether the <u>threat</u> of continuity is demonstrated.

<u>H.J. Inc.</u>, 492 U.S. at 241-42, 109 S. Ct. at 2902 (emphasis in original).  In "open-ended" cases that rely on alleging the <u>threat</u> of continuity, plaintiffs can meet their burden by establishing either that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or that "the

26

predicate acts or offenses are part of an ongoing entity's regular way of doing business." Id. at 242, 109 S. Ct. at 2902. In this case, the district court found that the plaintiffs had failed to establish either closed- or open-ended continuity. Jackson I, 181 F. Supp. 2d at 1358-61. We agree.

As the district court properly found, the plaintiffs' allegations plainly failed to allege facts sufficient to establish closed-ended continuity. While the plaintiffs generally alleged that the defendants committed mail and wire fraud violations that extended "over a substantial period of time," Third Amended Complaint, paragraph 70, the specific incidents they actually charged began only on April 22, 1997, and ended, at the very latest, sometime in January 1998. Third Amended Complaint, paragraph 67.[19] The plaintiffs maintain that no bright-line rule has been established definitively stating that nine months is too short a period to establish a "substantial period of time," for the purposes of closed-ended continuity. While the plaintiffs are correct that no court has unequivocally declared a minimum period of time that can be considered "substantial," the great

---

[19] The last specific mailing cited by the plaintiffs is dated on September 29, 1997, a date approximately five months after the first mailing on April 22, 1997; accordingly, this five-month period is likely the appropriate period to be considered. The January 1998 mailings were routine tax forms distributed by BellSouth. Third Amended Complaint, paragraph 67. Nevertheless, for the purposes of the closed-ended continuity analysis, the differences between a five-month and nine-month period are not dispositive, and, taking the evidence in the light most favorable to the plaintiffs, we will assume the plaintiffs have alleged acts occurring over a period of some nine months.

weight of authority suggests that nine months is a wholly insufficient interlude.

Any examination of the issue must begin with the Supreme Court's warning that predicate acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement . . . ." H.J. Inc., 492 U.S. at 242, 109 S. Ct. at 2902. This Circuit has determined that an alleged mail fraud scheme lasting approximately six months "was accomplished in too short a period of time . . . to qualify it as a pattern of racketeering activity." Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm., 953 F.2d 587, 593 (11th Cir. 1992); see also Hutchinson v. Wickes Cos., Inc., 726 F. Supp. 1315, 1320 (N.D. Ga. 1989) (questioning in dicta whether two years can be a "substantial period of time").

Other circuits have agreed that the substantial period of time requirement for establishing closed-ended continuity cannot be met with allegations of schemes lasting less than a year. See, e.g., Efron v. Embassy Suites (P. R.), Inc., 223 F.3d 12 (1st Cir. 2000) (finding no closed-ended continuity where predicate acts occurred over 21-month period; Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (stating that the Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time'"); GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 467-68 (2d Cir. 1995) (finding that courts of appeals have consistently considered eleven months to be

28

insufficiently "substantial"); Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 611 (3d Cir. 1991) ("[T]welve months is not a substantial period of time."); Menasco v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989) (finding no continuity when predicate acts with a single goal occurred over a one-year period); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir. 1994) (finding seventeen month period insufficient to show continuity); J.D. Marshall Int'l, Inc. v. Redstart, Inc., 935 F.2d 815, 821 (7th Cir. 1991) (concluding that thirteen months is not a substantial period of time); Wisdom v. First Midwest Bank of Poplar Bluff, 167 F.3d 402, 407 (8th Cir. 1999) (holding that ten-month period is "too short" to constitute substantial period for purposes of closed-ended continuity); Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 366-67 (9th Cir. 1992) ("We have found no case in which a court [of appeals] has held the [continuity] requirement to be satisfied by a pattern of activity lasting less than a year.").

The overwhelming weight of case authority suggests that nine months is not an adequately substantial period of time. Moreover, the alleged racketeering activity was related to the settlement of a single lawsuit, and, notably, was not designed to perpetrate racketeering with respect to a series of cases. Indeed, in cases like this one, where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of

29

racketeering even when the scheme took place over longer periods of time.  See, e.g., Efron, 223 F.3d at 18 (noting that "the fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims" supports the conclusion that there is no continuity); Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (predicate acts occurring over three year period insufficient to allege pattern of racketeering when complaint alleged a single scheme with a single goal);  see also Vicom, Inc. v. Harbridge Merchant Servs., 20 F.3d 771, 780 (7th Cir. 1994) (various factors besides temporal span should be considered in assessing continuity, including the number of victims, the presence of separate schemes, and the occurrence of distinct injuries); Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1543 (10th Cir. 1993) (in addition to duration, weighing "extensiveness" of the RICO scheme, including number of victims, number and variety of racketeering acts, whether the injuries caused were distinct, the complexity and size of the scheme, and the nature or character of the enterprise or the unlawful activity); United States v. Pelullo, 964 F.2d 193,  208 (3d Cir. 1992) ("We have eschewed the notion that continuity is solely a temporal concept, though duration remains the most significant factor."); U.S. Textiles,  Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1269 (7th Cir. 1990) ("[I]t is not irrelevant, in analyzing the

30

continuity requirement, that there is only one scheme." (internal quotation marks and citation omitted)).

In view of the narrow scope of the alleged racketeering activity and the limited time frame in which it is said to have taken place, the district court correctly held that the plaintiffs did not meet the closed-ended continuity requirement necessary to sustain a RICO violation. Jackson I, 181 F. Supp. 2d at 1359.

Just as the plaintiffs have failed to allege facts supporting a claim of closed-ended continuity, they have failed to state a claim based on open-ended continuity as well. To do so would require them to allege either that the alleged acts were part of the defendants' "regular way of doing business," or that the illegal acts threatened repetition in the future. H.J. Inc., 492 U.S. at 242-43, 109 S. Ct. at 2902.

As the district court observed, the plaintiffs' Third Amended Complaint itself completely eliminates the possibility that plaintiffs could prove that the allegedly illegal activity is part of the defendants' regular way of doing business. Jackson I, 181 F. Supp. 2d at 1360. In support of the § 1981 claim, plaintiffs say in paragraph 60 of the Third Amended Complaint that the defendants "have never before conspired and colluded to engage in the activities" that plaintiffs claim

31

constitute mail and wire fraud. Thus, according to the plaintiffs' own complaint, the defendants' actions in settling the Adams case were a unique, first-time occurrence; their own complaint makes clear that the alleged criminality was not part of the defendants' regular way of doing business. Accordingly, for the plaintiffs to successfully allege open-ended continuity, they must establish that the defendants' allegedly illegal acts posed a threat of continued criminal activity in the future.

While the plaintiffs argue, in paragraph 70 of their Third Amended Complaint, that each alleged incident of mail and wire fraud "poses a threat of continued criminal activity in the future," they offer no support for this general and conclusory allegation. Moreover, nowhere in the complaint do the plaintiffs suggest that the defendants would engage in predicate acts of mail and wire fraud to fraudulently settle future litigation. On appeal, the plaintiffs say that all future mail and wire communications between BellSouth and Ruden McClosky as part of their consulting agreement would represent new and distinct criminal acts. B&P Appellants' Brief at 30.

Even taking the evidence in the light most favorable to the plaintiffs, however, we cannot find that the evidence suggests the alleged acts of mail and wire fraud pose any threat of continued criminal activity reaching into the future.

Aside from the wholly conclusory allegation contained in paragraph 70, the plaintiffs make no claim that the defendants' conduct suggests a threat of future fraud. Moreover, any communication between BellSouth and Ruden McClosky under the consulting agreement -- an agreement specifically designed to preclude future litigation -- would not aim to fraudulently settle upcoming cases, since the agreement by its very nature sought to prevent precisely such litigation from developing in the first place.

Indeed, any communication under the consulting agreement could not have been aimed at perpetrating additional acts of fraud, but, if anything, would have sought to keep the original wrongdoing from being discovered. And in this Circuit, there is little question that attempts to conceal an initial fraudulent act are not sufficient to establish open-ended continuity. Aldridge, 953 F.2d at 593-94. In Aldridge, the plaintiffs alleged that their employer had used the mails for five years to conceal the "fraudulent taking" of the employee's vacation time. Id. at 592. We held that the defendants' "acts after the initial [wrongful] taking were allegedly performed in order to conceal their wrongdoing; they did not threaten future harm or a repetition of their illegal acts, nor did they impart any new injury" upon the plaintiffs. Id. at 594 (emphasis added). We concluded that the plaintiffs' allegations of ongoing acts aimed at concealing an initial wrongdoing did not

33

establish open-ended continuity.  Id.  Here, the plaintiffs have not alleged that any communication under the consulting agreement would aim at perpetrating future fraud, but rather, at most, just as in Aldridge, that it would aim to cover up the original wrongdoing.

Furthermore, in spite of the plaintiffs' bald suggestion that the defendants might have continued their fraud in the future had they not been uncovered, this is not sufficient to allege open-ended continuity.  Indeed, since the investigation did reveal and ultimately sanction the defendants' activities, it is virtually certain that they will not engage in similar conduct in the future.

In short, because the plaintiffs have failed to advance facts sufficient to support a theory of either open- or closed-ended continuity, they have not adequately pled a pattern of racketeering activity sufficient to survive the defendants' motion to dismiss.  The trial court properly dismissed the plaintiffs' substantive racketeering claims.

## B.

### *Plaintiffs' Federal and State RICO Conspiracy Claims*

The district court's analysis of the plaintiffs' RICO conspiracy claims was equally sound.  The pertinent provisions of the federal and state RICO laws can be violated when defendants "conspire to violate any of" the substantive provisions

34

of the RICO laws.  18 U.S.C. § 1962(d); see also Fla. Stat. § 772.103(4).  The district court properly dismissed the plaintiffs' RICO conspiracy claims precisely because the plaintiffs failed to allege an illegal agreement to conduct acts of a sufficiently continuous nature to constitute a pattern of racketeering activity.

The plaintiffs protest that the trial court erred in dismissing their RICO conspiracy claims because a party may be liable for RICO conspiracy even if it is not liable for the substantive RICO offense.  See, e.g., Salinas v. United States, 522 U.S. 52, 62-64, 118 S. Ct. 469, 476-77,  139 L. Ed. 2d 352 (1997); United States v. Shenberg, 89 F.3d 1461, 1479 (11th Cir. 1996).  While this observation is undoubtedly correct, the plaintiffs' argument fails to acknowledge that what is required to support a claim of RICO conspiracy is that plaintiffs allege an illegal agreement to violate a substantive provision of the RICO statute.  See 18 U.S.C. § 1962(d); Fla. Stat. § 772.103(4). This they have failed to do.

"To be guilty of conspiracy, . . . parties must have agreed to commit an act that is itself illegal -- parties cannot be found guilty of conspiring to commit an act that is not itself against the law." United States v. Vaghela, 169 F.3d 729, 732 (11th Cir. 1999); see also Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1199 (11th Cir. 2004) ("If the underlying cause of action is not viable, the conspiracy claim must also fail." (internal quotation marks and citation omitted)).

35

We have already found that the complaint failed to state a substantive RICO claim, and the RICO conspiracy adds nothing. It simply concludes that the defendants "conspired and confederated" to commit conduct which in itself does not constitute a RICO violation.

Quite simply, the plaintiffs have failed to allege that the BellSouth defendants agreed to violate any of the substantive provisions of the RICO laws. Because of this fatal pleading defect, the plaintiffs' RICO conspiracy claims are likewise unable to survive the defendants' motion to dismiss.

C.

*Plaintiffs' Section 1981 Claim of Race Discrimination*

The plaintiffs also say that the trial court erred by dismissing their § 1981 claim against BellSouth for failing to allege facts sufficient to support the theory that racial animus motivated the actions of the defendants. The trial court dismissed without prejudice the plaintiffs' § 1981 claim in the Third Amended Complaint. Jackson I, 181 F. Supp. 2d at 1353-56. Plaintiffs realleged § 1981 race discrimination in a Fourth Amended Complaint; the district court again determined that they had failed to advance sufficient factual allegations, and again dismissed the § 1981 claim, this time with prejudice. Jackson II at 15. The plaintiffs appeal the dismissal of the Fourth Amended Complaint.

36

To state a claim of race discrimination under § 1981, plaintiffs must allege facts establishing: (1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.[20] Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1235 (11th Cir. 2000). There is no question that the plaintiffs, as African-Americans, are members of a racial minority,[21] and that they have alleged discrimination concerning an enumerated activity: the right to make and enforce contracts, to sue, and to give evidence. The issue central to resolution of their § 1981 claim, then, is whether

---

[20] The pertinent portion of Section 1981 states:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United states shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . .
>
> . . . .
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(a), (c).

[21] The complaint excluded a white plaintiff, Donald McGuckian, from the § 1981 claim. McGuckian was a co-plaintiff in all other claims.

the plaintiffs have alleged facts sufficient to support the second prong -- that the BellSouth defendants engaged in intentional racial discrimination.  See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150, 73 L. Ed. 2d 835 (1982) (holding that "§ 1981, like the Equal Protection Clause, can only be violated by purposeful discrimination" (emphasis added)) .

The plaintiffs urge that the district court employed an unduly demanding standard in reviewing their claims.  They place significant reliance on Swierkiewicz v. Sorema, N.A., where the Supreme Court held that an employment discrimination complaint, arising under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq., need not contain specific facts establishing a prima facie case under McDonnell Douglas, but rather need only lay out a short statement of the claim showing that the pleader is entitled to relief.  534 U.S. 506, 510-11, 122 S. Ct. 992, 997, 152 L. Ed. 2d 1 (2002); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  In Swierkiewicz, the Court explained that McDonnell Douglas was an evidentiary rather than a pleading standard.  Swierkiewicz., 534 U.S. at 510-11, 122 S. Ct. at 997.  The plaintiffs maintain that their Fourth Amended Complaint meets the minimal pleading burden required by Swierkiewicz.

At the outset, it is important to explicate the holding of Swierkiewicz, and how its pleading standards have been understood within this Circuit. First, while Swierkiewicz made clear that pleading a McDonnell Douglas prima facie case was not necessary to survive a motion to dismiss, it did not even remotely suggest that a pleading could survive dismissal when it consisted of only the barest of conclusory allegations without notice of the factual grounds on which they purport to be based. See Swierkiewicz, 534 U.S. at 508 n.1, 122 S. Ct. at 996 n.1 ("Because we review here a decision granting respondent's motion to dismiss, we must accept as true all of the factual allegations contained in the complaint." (emphasis added)); id. at 514, 122 S. Ct. at 999 (finding pleadings sufficient because "[t]hese allegations give respondent fair notice of what [the plaintiff's] claims are and the grounds upon which they rest." (emphasis added)). As the district court concluded in this case, in Swierkiewicz, "the Court did not hold that the complaint's factual allegations were entirely ancillary." Jackson II at 6 (emphasis in original).

We have echoed the district court's understanding of Swierkiewicz in Wagner v. Daewoo Heavy Indus. Am. Corp., 289 F.3d 1268 (11th Cir.), rev'd on other grounds, 314 F.3d 541 (11th Cir. 2002) (en banc). In Wagner, a terminated employee brought a federal civil rights action against his former employer under

39

42 U.S.C. § 1985. In a portion of the <u>Wagner</u> panel's decision that was not challenged in the <u>en banc</u> hearing, a panel of this Court noted that while "a plaintiff is not held to a very high standard in a motion to dismiss for failure to state a claim, some minimal pleading standard does exist." <u>Wagner</u>, 289 F.3d at 1270. "Pleadings must be something more than an ingenious academic exercise in the conceivable." <u>Id.</u> (quoting <u>Marsh v. Butler County</u>, 268 F.3d 1014, 1037 (11th Cir. 2001) (en banc) (quoting <u>United States v. Students Challenging Regulatory Agency Procedures</u>, 412 U.S. 669, 688, 93 S. Ct. 2405, 2416, 37 L. Ed. 2d 254 (1973))).

The <u>Wagner</u> court observed that "unsupported conclusions of law or of mixed law and fact are not sufficient to withstand a dismissal under Rule 12(b)(6)." 289 F.3d at 1271.[22] Because the <u>Wagner</u> plaintiff's complaint failed to set forth <u>any</u> facts which would support an inference that the plaintiff's employer had acted with the requisite intent, the court concluded that "applying the ordinary rules of pleading, this wholly conclusory allegation is insufficient to meet even the liberal standard of notice pleading." <u>Id.</u> at 1273.

---

[22] As the district court in this case noted, "[o]ther post-<u>Swierkiewicz</u> appellate decisions appear to be in accord." <u>Jackson II</u> at 7 (citing <u>Iodice v. United States</u>, 289 F.3d 270, 280-81 (4th Cir. 2002); <u>York v. Ass'n. of the Bar of the City of New York</u>, 286 F.3d 122, 125 (2d Cir.) ("To survive a motion to dismiss . . . the complaint must allege facts which, assumed to be true, confer a judicially cognizable right of action."), <u>cert. denied</u>, 537 U.S. 1089, 123 S. Ct. 702, 154 L. Ed. 2d 633 (2002)).

The liberal standard of notice pleading still requires a plaintiff to provide the defendant with fair notice of the factual grounds on which the complaint rests. An examination of the allegations contained in the plaintiffs' Fourth Amended Complaint shows that they do not meet the standard. Paragraph 67 of the Fourth Amended Complaint alleges, again in conclusory fashion, that "[t]he actions of the DEFENDANTS were intentional, purposeful, and were motivated by the race of the PLAINTIFFS, excluding MCGUCKIAN," and cites the following as support for this claim: (1) the BellSouth defendants insisted that the practice restriction and consulting agreements be included in the settlement terms; (2) BellSouth's in-house attorneys, Semmes and Kochler, controlled the litigation rather than allowing local counsel to take the lead; (3) the in-house attorneys appeared pro hac vice "to maintain the secrecy of the [racially discriminatory] settlement terms"; (4) BellSouth requested that all documents not responsive to requests for production be returned to BellSouth; (5) the sanctions for disclosing the terms of the settlement were onerous; (6) the BellSouth defendants knowingly conspired with Ruden McClosky to steal settlement proceeds from the plaintiffs; and, finally, (7) the BellSouth defendants continue to impede Plaintiffs' discovery requests.

Paragraph 67 of the Fourth Amended Complaint also asserts that, because the plaintiffs were African-American, the BellSouth defendants "believed that the

41

PLAINTIFFS were not sufficiently intelligent or sophisticated to inquire or insist on disclosure of the settlement terms and amounts, and could therefore be duped[.]" Similarly, paragraph 67 avers that "had the PLAINTIFFS in the Adams Case, excluding MCGUCKIAN, been Caucasian, [the BellSouth defendants] would not have conspired and colluded" against them. In paragraph 68, without offering any specific examples, or indeed any basis, the plaintiffs simply say that the BellSouth defendants' treatment of them "differs markedly from their treatment of Caucasian plaintiffs" in other cases.

Finally, in paragraph 70, the plaintiffs include their most factually specific charge, but it actually cuts against their position. Here, they cite a specific racial discrimination case where the plaintiffs were similarly situated African-Americans represented by Ganz, which was settled by the BellSouth defendants. However, the plaintiffs point out that the settlement "did not include a practice restriction agreement or consulting agreement as part of the settlement." Since the supposedly similarly situated plaintiffs in the other case were African-American, and the BellSouth defendants did not settle their case on questionable terms, the inference that the defendants' behavior in <u>Adams</u> was motivated by race drops away. As a result, as the district court described it, this paragraph serves as a

concession which is "the death knell to plaintiffs' claims, as if they have fallen on their own sword." Jackson II at 12-13.

None of the other allegations are sufficient to survive a motion to dismiss. Most easily dispensed with are the charges that the defendants would not have conspired and colluded against them "had the PLAINTIFFS . . . been Caucasian," and that the defendants believed the plaintiffs were not sufficiently intelligent or sophisticated because they were African-American. These "wholly conclusory allegations" lack any factual support and are "insufficient to meet even the liberal standard of notice pleading." Wagner, 289 F.3d at 1273.

We turn next to the plaintiffs' claims that racial animus is somehow demonstrated by the defendants' attempts to keep the settlement terms secret and to handle the case with in-house attorneys. First, as opposing counsel, the BellSouth attorneys plainly had no obligation to convey the settlement terms to the plaintiffs. Indeed, because the plaintiffs were represented by counsel, such action on the part of the BellSouth lawyers would have constituted an ethical violation.[23] Second, the plaintiffs admitted in their Second Amended Complaint, paragraph 15,

---

[23]Florida's Rule of Professional Conduct 4-4.2, entitled "COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL" provides unambiguously, in pertinent part, that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."

43

that the BellSouth defendants actually retained a South Florida law firm to assist with the <u>Adams</u> case, undermining any suggestion -- even if it could yield an unfavorable inference -- that the BellSouth lawyers chose to oversee the case themselves for discriminatory reasons. Finally, the fact that the BellSouth attorneys actually appeared <u>pro hac vice</u> does nothing to support an inference that the decision to appear was racially motivated, especially since counsel had done so in a variety of other cases throughout the nation.[24] Even accepting as true that BellSouth's in-house attorneys chose to oversee a complicated case themselves, there is nothing whatsoever in the pleadings to support the claim that they did so for racially discriminatory reasons. We are simply at a loss to understand how or why the continuing involvement of in-house corporate counsel in a large and complex discrimination lawsuit yields any inference of discriminatory animus.

Equally unpersuasive is the plaintiffs' claim that racial animus is somehow shown by the BellSouth defendants' request that plaintiffs' lawyers in <u>Adams</u> return discovery documents that were not responsive to requests for production. The plaintiffs say that this request was made "to limit the exposure of its racially

---

[24] <u>See, e.g.</u>, <u>BellSouth Telecomm., Inc. v. City of Mobile</u>, 171 F. Supp. 2d 1261, 1262 (S.D. Ala. 2001) (listing Semmes as counsel for BellSouth in litigation concerning municipal construction ordinance); <u>McClusky v. BellSouth Med. Assistance Plan</u>, 23 F. Supp. 2d 1312, 1313 (D. Utah 1998) (listing Kochler as counsel for BellSouth in ERISA case); <u>Hilliard v. BellSouth Med. Assistance Plan</u>, 918 F. Supp. 1016, 1018-19 (S.D. Miss. 1995) (listing Kochler as counsel for BellSouth in suit involving Americans with Disabilities Act).

discriminatory practices."  Intuitively, however, since <u>Adams</u> was a race discrimination lawsuit, the documents which were <u>responsive</u> to requests would be far more likely to contain information relating to the alleged discrimination than those documents which were <u>not</u> responsive.  That the BellSouth defendants requested the return of documents that did not touch on issues related to race discrimination in no way suggests that their actions in the <u>Adams</u> settlement were motivated by racial discrimination.  Moreover, the claim that the BellSouth defendants acted with racial animus in <u>Adams</u> simply because they resisted some discovery in the instant case is wholly unpersuasive.  Actions taken in discovery during a later lawsuit (especially this one) do not suggest that the defendants were somehow motivated by racial discrimination during the course of settling an earlier one.

Finally, the wholly unsupported charge that the BellSouth defendants acted differently in cases not involving minority plaintiffs, even if it were supported by some specific facts or examples, is not sufficient to state a claim for racially motivated discrimination.  When comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race,  <u>Jones v. Bessemer Carraway Medical Center</u>, 137 F.3d 1306, 1311 (11th Cir. 1998) (involving Title VII claim), since

45

"[d]ifferent treatment of <u>dissimilarly</u> situated persons does not violate" civil rights laws. <u>E & T Realty v. Strickland</u>, 830 F.2d 1107, 1109 (11th Cir. 1987) (addressing equal protection claim).

Plaintiffs here failed to identify <u>any</u> specific nonminority employees of BellSouth who were treated differently in other similar cases. Indeed, plaintiff Donald McGuckian, a white employee involved in the very same <u>Adams</u> settlement, was treated identically to the African-American plaintiffs. This undercuts any suggestion that race was a motivating factor for the defendants' actions. The basic pleading problem remains exactly the same: the plaintiffs' charges are wholly conclusory, generalized, and non-specific claims of disparate treatment. These are simply insufficient to survive BellSouth's motion to dismiss. The plaintiffs have not alleged <u>any</u> facts that support so much as an inference that racial animus motivated the defendants. And some of the specific grounds the plaintiffs have advanced actually suggest quite the opposite -- that race was in fact <u>not</u> a motivating factor. As the district court correctly concluded, "[t]he facts alleged do not relate to the race of the plaintiffs, and the allegations relating to race are not factually supported." <u>Jackson II</u> at 13.

In short, the district court applied the correct pleading standard to the plaintiffs' allegations, and properly found that their conclusory allegations were

46

wholly unsupported by any specific factual averments. Accordingly, we affirm the dismissal of plaintiffs' § 1981 claim.

D.

*Plaintiffs' State Law Claims and Florida's "Litigation Privilege"*

Plaintiffs also argue that the district court erred in finding that their state law claims for tortious interference and conspiracy to defraud were barred by Florida's "litigation privilege." Plaintiffs say that Florida's litigation privilege does not apply to the type of conduct they have alleged in this case. Plaintiffs also maintain, as an affirmative defense, that the litigation privilege may not be considered on a motion to dismiss.

Florida's litigation privilege affords absolute immunity for acts occurring during the course of judicial proceedings. The privilege initially developed to protect litigants and attorneys from liability for acts of defamation, but has since been extended to cover all acts related to and occurring within judicial proceedings. See Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins. Co., 639 So. 2d 606, 607-08 (Fla. 1994). In Levin, the Florida Supreme Court explained the scope and rationale of the privilege:

> [A]bsolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement or other tortious behavior . . . so long as the

act has some relation to the proceeding. The rationale behind the immunity afforded to defamatory statements is equally applicable to other misconduct occurring during the course of a judicial proceeding. Just as participants in litigation must be free to engage in unhindered communication, so too must those participants be free to use their best judgment in prosecuting or defending a lawsuit without fear of having to defend their actions in a subsequent civil action for misconduct.

639 So. 2d at 608. Because we are Erie-bound to apply Florida law in evaluating the plaintiffs' supplemental state-law claims, Florida's litigation privilege applies to the state-law claims adjudicated in federal court. See Green Leaf Nursery v. E.I. DuPont de Nemours & Co., 341 F.3d 1292, 1302-03 (11th Cir. 2003); Fla. Evergreen Foliage v. E.I. DuPont De Nemours & Co., 135 F. Supp.2d 1271, 1280 (S.D. Fla. 2001).

The district court, applying the litigation privilege as it has been construed by the highest state court in Florida, determined that the BellSouth defendants were immune from the plaintiffs' tortious interference and conspiracy to defraud claims. Jackson I, 181 F. Supp. 2d at 1363. Contrary to the plaintiffs' claim that the actions complained about were only tangentially related to settling the Adams lawsuit, the district court concluded that "the occurrences from which plaintiffs' claims arise have everything to do with the settlement of a lawsuit, which is a

crucial element in concluding the vast majority of civil litigation today." Id.[25]

Indeed, the plaintiffs' state law claims rest on allegations that the defendants improperly extracted an unfairly low settlement from the plaintiffs, and negotiated settlement terms that allowed plaintiffs' counsel to take too high a percentage of the settlement funds. These actions, taken in the course of settlement negotiations, are inextricably linked to the process of guiding ongoing litigation to a close -- actions we conclude are protected by Florida's litigation privilege. Cf. Green Leaf Nursery, 341 F.3d at 1303 n.10 (noting that Florida courts have not decided whether the litigation privilege applies to settlement negotiations).

Although we are aware of no decision in which a Florida court has squarely held that the litigation privilege applies to actions exactly like those taken by the BellSouth defendants to settle the ongoing, protracted litigation at issue here, we agree with those courts that have applied similar litigation privileges to settlement activities, and believe that Florida's courts would do so too.[26] Applying New

---

[25]See Robbie v. City of Miami, 469 So. 2d 1384, 1385 (Fla. 1985) ("[S]ettlements are highly favored and will be enforced whenever possible."); Feldman v. Kritch, 824 So. 2d 274, 277 (Fla. Dist. Ct. App. 2002) ("Settlements are highly favored as a means to conserve judicial resources, and will be enforced when it is possible to do so.").

[26]It is true that Hatcher v. Dixon, 660 So. 2d 1105 (Fla. Dist. Ct. App. 1995), contains dicta suggesting that the litigation privilege does not extend to settlement negotiations. However, the Hatcher court merely assumed, and did not decide that the litigation privilege did not apply to settlement negotiations. Id. at 1108. In addition, while it is true that in Pledger v. Burnup & Sims, Inc., 432 So. 2d 1323, 1326-28 (Fla. Dist. Ct. App. 1983), a panel of Florida's Fourth District Court of Appeals found that statements made during settlement discussions

49

Jersey law, the Third Circuit observed that "the negotiation of a settlement is part of a judicial proceeding," and "the termination of litigation through settlement is a judicially favored way of disposing of litigation," and found, therefore, that a non-party insurer was absolutely immune from a defamation claim based on statements made at a settlement conference. Petty v. Gen. Accident Fire & Life Assurance Corp., 365 F.2d 419, 421 (3d Cir. 1966); see also Ruberton v. Gabage, 654 A.2d 1002, 1006-07 (N.J. Super. Ct. App. Div. 1995) (threats of criminal prosecution made by attorney during settlement conference protected by absolute privilege afforded to judicial proceedings).

Similarly, California's litigation privilege has been applied to actions taken in settlement negotitations. See, e.g., Arochem Int'l, Inc. v. Buirkle, 968 F.2d 266,

---

before suit was filed were subject only to a qualified privilege, Pledger plainly did not hold that the absolute privilege was inapplicable to settlement negotiations during the course of ongoing litigation.

In a notice of supplemental authority, appellants also argue that under Ingalsbe v. Stewart Agency, Inc., 869 So. 2d 30 (Fla. Dist. Ct. App. March 3, 2004), the litigation privilege does not bar a tortious interference claim arising out of settlement negotiations. In that case, a split panel of Florida's Fourth District Court of Appeals held that the litigation privilege did not bar a lawyer's claim for tortious interference with an attorneys-fees contract brought against an automobile dealer that settled a claim with the lawyer's client. We are unpersuaded by the appellants' broad reading of Ingalsbe, however, since that case is plainly distinguishable from this one. The claim in Ingalsbe alleged interference in the lawyer's professional or business activities, as is generally necessary to support a tortious interference claim. See, e.g., Garrison v. Thomas Mem. Hosp. Ass'n, 438 S.E. 2d 6, 14 (W. Va. 1993) ("The type of injury alleged in an action for tortious interference . . . is damage to one's business or occupation." (emphasis added)). The rationale underlying Ingalsbe is not implicated here, where the appellants have not alleged any interference with their occupations or other professional activities.

50

271-72 (2d Cir. 1992) (statements made to encourage settlement of litigation absolutely privileged under California's litigation privilege); Joseph A. Saunders, P.C. v. Weissburg & Aronson, 87 Cal. Rptr. 2d 405, 408 (Cal. Ct. App. 1999) (statements made during the course of settlement are absolutely privileged). Florida law suggests that the Florida courts would agree that "events taking place outside the courtroom during discovery or settlement  discussions are no less an integral part of the judicial process, and thus deserving of the protection of the [litigation] privilege, than in-court proceedings." Hoover v. Van Stone, 540 F. Supp. 1118, 1122 (D. Del. 1982) (applying Delaware law).

Because we believe that the settlement negotiations at issue here -- aimed at steering this complex, ongoing, protracted and expensive litigation to a conclusion -- occurred during the course of a judicial proceeding and had a substantial relation to that proceeding, see Levin, 639 So. 2d at 608, we conclude that district court's application of Florida's absolute litigation privilege to the conduct at question was appropriate.[27]

---

[27] Indeed, the plaintiffs' own description of the nature of the case, in paragraph 15 of their Third Amended Complaint, undermines their position that the allegedly tortious conduct was somehow outside or unrelated to the litigation in question, since the plaintiffs themselves assert that they seek "damages for the injustices they suffered as a result of the fraudulent and collusive activities of DEFENDANTS during the settlement of the Adams case."

51

The plaintiffs argue, nevertheless, that the improper conduct engaged in by the BellSouth defendants is of a vastly different nature than the conduct generally protected by the privilege. However, the case law plaintiffs cite is inapposite and does not support their position.

First, the plaintiffs rely on American National Title & Escrow of Florida, Inc. v. Guarantee Title & Trust Co., 810 So. 2d 996 (Fla. Dist. Ct. App. 2002), to support the idea that illegal and fraudulent conduct is not protected by the litigation privilege. Leaving aside the question of whether the plaintiffs have successfully alleged illegal conduct on the part of the BellSouth defendants, their reliance on American National Title is misplaced. In that case, the defendants hoped to extort a settlement and put the plaintiff out of business. To that end, they conspired to maliciously give false information to law enforcement authorities, resulting in the plaintiff being wrongfully jailed. 810 So. 2d at 998. Notably, the misconduct involved torts committed outside the judicial process which were undertaken to harass and intimidate the plaintiff into abandoning her claims. There was no such extra-judicial tortious activity involved in negotiating the Adams case. Rather, in Adams, all of the behavior about which plaintiffs complain was directly related to the settlement terms and negotiations.

The plaintiffs also cite SCI Funeral Services of Florida, Inc. v. Henry, 839 So. 2d 702 (Fla. Dist. Ct. App. 2002), claiming that the court "refused to apply the litigation privilege to a fraudulent settlement demand letter stating that 'there must necessarily be a judicial remedy for such conduct.'" B&P Appellants' Reply Brief at 17 (quoting Henry, 839 So. 2d at 706). Reliance on this case is inappropriate as well. In the first place, in Henry, a panel of Florida's Third District Court of Appeals expressly refused to reach the question of whether the litigation privilege was applicable to the defendant's behavior, finding that the defendant was estopped from raising it. 839 So. 2d at 706.

Moreover, even if the court had reached the issue, the context was very different from the present case. In Henry, the defendant was the plaintiff's former employer, who sent a letter to the plaintiff and his employer threatening litigation over a non-compete agreement the plaintiff had signed. Id. at 703-05. The plaintiff sued his former employer for tortious interference with his relationship with his current employer. Id. The Henry court held only that a judicial remedy was available when an employer wrongly threatens an employee with litigation over a non-compete agreement that has expired. Id. at 706.

Finally, the plaintiffs say that the litigation privilege is an affirmative defense that may not properly be considered on a motion to dismiss. It is true that

Florida courts have described the privilege as an affirmative defense. See, e.g., Am. Nat'l Title, 810 So. 2d at 998. However, the Florida courts have also made it abundantly clear that any affirmative defense, including the litigation privilege, may be considered in resolving a motion to dismiss when "'the complaint affirmatively and clearly shows the conclusive applicability' of the defense to bar the action." Reisman v. Gen. Motors Corp., 845 F.2d 289, 291 (11th Cir. 1988) (quoting Evans v. Parker, 440 So. 2d 640, 641 (Fla. Dist. Ct. App. 1983)). Here, the complaint "affirmatively and clearly" establishes that the challenged conduct related to the Adams litigation, and therefore, that the litigation privilege bars the action.

Quite simply, because the plaintiffs' complaint concerns conduct that lay at the heart of the attempts to resolve the ongoing judicial proceedings in the Adams litigation, Florida's litigation privilege bars their state law claims. Where, as here, the conduct in question is inherently related to, and occurs during an ongoing judicial proceeding, under Florida law, that conduct must be protected so that participants in a lawsuit are unhindered in exercising their judgement as to the best way to prosecute or defend the lawsuit. See Levin, 639 So. 2d at 608. The district court's application of Florida's litigation privilege was proper, and we affirm its

54

dismissal of the supplemental state claims for tortious interference and conspiracy to defraud.

E.

*The Waiver Provisions of the General Releases Executed to Settle <u>Adams</u>*

The plaintiffs also appeal the district court's determination that the plaintiffs' signing of general release forms provided an alternate ground for dismissing their § 1981 claims against BellSouth. In its order dismissing the plaintiffs' § 1981 claim against the BellSouth defendants, the district court concluded, as an independent reason to dismiss the § 1981 claims, that the plaintiffs were barred by the general releases they executed as part of the <u>Adams</u> settlement. The district court concluded that "in order to opt out of their prior settlement [and its waiver provision,] a plaintiff must first disgorge all benefits already received or due to be received under the terms of the settlement." <u>Adams</u> Omnibus Order at 26; <u>see also</u> <u>Jackson II</u> at 13. The plaintiffs claim error here too, urging that their claims should not be barred by "fraudulently procured" releases. B&P Appellants' Brief at 20.

Initially, we observe that, while the district court ruled only that the plaintiffs' § 1981 claims were barred by the terms of the waivers, the logic of that

55

determination could be extended to support the conclusion that each of the plaintiffs' other claims was barred by these releases as well.[28]

Each of the plaintiffs who settled his claims against BellSouth in the Adams case signed a general release, which unambiguously waived "all claims against BellSouth, whether known or unknown . . . [that are] a result of acts or omissions occurring through the date of the Release." The plaintiffs' instant suit seeks damages from BellSouth for conduct occurring before and during the settlement of the Adams settlement, conduct that took place before the releases were signed. If the plain terms of the releases are given effect, then, the plaintiffs' current action against BellSouth is barred.

The plaintiffs say that they should not be held to the clear terms of the releases because they were fraudulently induced into signing them. However, as the district court pointed out, "[i]t is axiomatic that fraudulent inducement renders a contract voidable, not void." Mazzoni Farms, Inc. v. E.I. Dupont de Nemours & Co., 761 So. 2d 306, 313 (Fla. 2000). To be excused from the consequences of their waiver, the plaintiffs would have to seek rescission of the contract

---

[28] Of course, these general releases could bar only the claims of those plaintiffs who actually signed them in the course of settling the Adams case. Therefore, those plaintiffs who did not participate in the Adams settlment -- Kenneth Covin, Juanita Jackson, Sarah Jones, and Zadie Wimberly -- could not have their claims barred by waivers signed by other plaintiffs, if they had otherwise alleged valid claims. We have found those claims to be meritless, however, based on other grounds.

56

embodying the terms of the waiver, and to disgorge the benefits they have already

received under the contract.  As explained in Mazzoni Farms:

> Consistent with the majority view, Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract. A prerequisite to rescission is placing the other party in status quo. . . .
>
> A damages claim, by contrast, affirms the contract, and thus ratifies the terms of the agreement.  This principle ensures that a party who accepts the proceeds and benefits of a contract remains subject to the burdens the contract places upon him.

761 So. 2d at 313 (internal citations and quotation marks omitted).

Florida law requires plaintiffs to make an election of remedies, choosing

between rescission, in which a voidable contract is repudiated, and damages, in

which the contract is affirmed.  "The two remedies . . . . [are] mutually exclusive.

A claim for rescission is predicated on disavowal of the contract.  A claim for

damages is based upon its affirmance."  Deemer v. Hallett Pontiac, Inc., 288 So.

2d 526, 527-28 (Fla. Dist. Ct. App. 1974).  The plaintiffs cannot pursue a claim for

damages, since doing so would require them to affirm the settlement agreement,

including the waiver of claims contained within the general releases they signed.

In order to proceed with claims that are plainly barred by the terms of the

general releases, the plaintiffs would have to choose rescission.   As the Mazzoni

57

court noted, however, the prerequisite to rescission is placing the other party in status quo. 761 So. 2d at 313; see also Lang v. Horne, 23 So. 2d 848, 853 (Fla. 1945). In addition, a party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission. See Mazzoni, 761 So. 2d at 313; Rood Co. v. Bd. of Pub. Instruction, 102 So. 2d 139, 141- 42 (Fla. 1958).

Applying these long-settled principles of Florida law to this case, it is clear that the plaintiffs would have to remit the benefits of the voidable contract -- the monies received as part of the settlement agreement -- in order to rescind the settlement agreement and escape its release provision. This conclusion is identical to the one reached by the district court. See Jackson II at 13.

While the plaintiffs say they need not disgorge the funds in any event, we remain unconvinced. As the district court explained, "[t]his would defeat the rescission-damages election principle" since it "would allow a party to retain the benefits received, sue for rescission, and if unsuccessful, the party would be out nothing." Jackson II at 14. Florida law leaves no room for debate over when a party must disgorge the benefits of an agreement whose terms it seeks to avoid. The plaintiffs here seek to have it both ways: they wish to retain the benefits of

their settlement agreement while simultaneously challenging its burdens. Florida law does not provide them with such a windfall.

In order to avoid the burdensome aspects of the agreement, including its waiver of claims, the plaintiffs were required to renounce its benefits by disgorging the payments they received. The plaintiffs have not done so. Accordingly, we embrace the district court's reasoning and conclude that plaintiffs' claims are barred by the unequivocal terms of the general releases they signed.

### III.

Finally, we turn to Sarah Jones's appeal from the district court's entry of summary judgment in favor of Ruden McClosky on her claims against the law firm. We review a district court's rulings on motions for summary judgment <u>de novo</u>, applying the same legal standards that bound the district court. <u>See, e.g.</u>, <u>Nat'l Fire Ins. Co. of Hartford v. Fortune Const. Co.</u>, 320 F.3d 1260, 1267 (11th Cir.), <u>cert. denied</u>, 124 S. Ct. 221, 157 L. Ed. 2d 133 (2003). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). "Where the record taken as a

whole could not lead a rational trier of fact to find for the non moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968)).

In making this determination, we "must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). "All reasonable doubts about the facts should be resolved in favor of the non-movant." Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982) (citations omitted)).

Jones maintains that the district court erred in granting summary judgment for the Ruden McClosky defendants on her common law claims. The district court concluded that "the essential thrust of all of Plaintiff Jones's state law claims of breach of contract, breach of fiduciary duty and malpractice is that of legal malpractice." Jackson III at 6. The court then analyzed Jones's claims by applying the principles of Florida malpractice law, concluding that while Jones raised an issue of fact about whether she reasonably believed an attorney-client

60

relationship existed, id. at 9, the Ruden McClosky defendants never assumed any duty to Jones, since they did not know and had no reason to know of her existence. Id. at 10.

A.

Before addressing the merits, we highlight the essential facts relevant to her claims. Jones never signed a retainer agreement with Ruden McClosky, was not a plaintiff in the Adams lawsuit, and, indeed, never even spoke to Barry Mandelkorn or any other Ruden McClosky employee. Nor does her name appear on any of the correspondence between the Ruden McClosky and Ganz firms, or on any correspondence between Ruden McClosky and BellSouth.

Jones asserts, nevertheless, that she was a BellSouth employee until August 1, 1993; that she contacted the Ganz law firm at least three times; that Ganz's office informed her they were associating with Ruden McClosky; and that on three occasions in the summer of 1997, she was contacted by different employees of the Ganz firm who directed her to appear at the offices of Ruden McClosky to sign settlement papers. Jones says that she believed -- albeit incorrectly -- that at least two of these Ganz employees were employees of Ruden McClosky. As a result, Jones claims that she developed an objectively reasonable belief that she was represented by Ruden McClosky. Jones maintains, in the alternative, that she was

61

a third party beneficiary of Ruden McClosky's agreements to seek benefits for similarly situated African-American employees of BellSouth. Jones also says, without explaining why, that Ruden McClosky "must have known of her existence" because they agreed to represent her sister, Zadie Wimberly.

Finally, Jones says that she was a Ruden McClosky client because she was included as a recipient of funds from a penalty paid by Ruden McClosky after the Adams case settled. After an investigation of the firm's role in the Adams settlement, Ruden McClosky agreed to a Consent Report and Recommendation, accepting sanctions that included creating a monetary fund to benefit those involved in the Adams settlement. See Adams v. BellSouth Telecomm., Inc., Consent Report and Recommendation Concerning Ruden McClosky and Mandelkorn, No. 96-2473- Civ-MIDDLEBROOKS (S. D. Fla. August 31, 2000). However, after the fund was created, several individuals who had not participated in the Adams settlement, including Jones, asserted claims on the fund. A controversy arose as to the propriety of including these newcomers, and it became apparent that the costs of litigating the issue of who could make a claim outweighed the marginal cost of allowing the additional claimants. As a result, the Ruden McClosky defendants dropped their objection to including the new

claimants, on the express condition that the payments would not have any collateral estoppel effect.  Jones then accepted payment from the penalty fund.

B.

Jones's claims relating to Ruden McClosky's alleged misconduct are plainly governed by Florida's legal malpractice law.  Under Florida law, in order to prevail on a legal malpractice claim, "a plaintiff must establish the existence of three essential elements: (1) that the defendant attorney was employed by the plaintiff; (2) that the defendant attorney neglected a reasonable duty owed to the plaintiff; and (3) that such negligence was the proximate cause of loss to the plaintiff."  Olmsted v. Emmanuel, 783 So. 2d 1122, 1125 (Fla. Dist. Ct. App. 2001).  Because Jones never retained Ruden McClosky, and during the Adams litigation neither appeared in their offices nor spoke to anyone from Ruden McClosky, we conclude that Ruden McClosky was never employed by Jones.  "Florida courts have uniformly limited attorneys' liability . . . to clients with whom they share privity of contract" or who qualify as third party beneficiaries. Winston v. Brogan, 844 F. Supp. 753, 756 (S.D. Fla. 1994).  As developed more fully, infra, we conclude that Jones was neither a client of Ruden McClosky nor a third party beneficiary of Ruden McClosky's association with Ganz.  Accordingly, Jones's claims must fail.

As for the threshold employment requirement, "the existence of a formal retainer agreement is not essential" to finding an attorney-client relationship, Eggers v. Eggers, 776 So. 2d 1096, 1099 (Fla. Dist. Ct. App. 2001), and a client need not pay a fee to form an attorney-client relationship. The Florida Bar v. King, 664 So. 2d 925, 927 (Fla. 1995). The test Florida courts have used to determine whether a lawyer-client relationship exists in the absence of a formal retainer "is a subjective one and 'hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice.' However, '[t]his subjective belief must . . . be a reasonable one.'" Bartholomew v. Bartholomew, 611 So. 2d 85, 86 (Fla. Dist. Ct. App. 1992) (emphasis added) (quoting Green v. Montgomery County, Ala., 784 F. Supp. 841, 845-46 (M.D. Ala. 1992)).[29]

---

[29] The subjective belief test is only applied after a putative client consults with an attorney, and is used to emphasize that, following a consultation, it is the belief of the putative client and not the lawyer's actions that determines whether a lawyer-client relationship has developed. Dean v. Dean, 607 So. 2d 494, 496-97 (Fla. Dist. Ct. App. 1992). Requiring a subjective belief to be reasonable makes sense, since the subjective belief of a "client" that he has retained a lawyer whom he has never consulted -- or even spoken to -- cannot be an objectively reasonable one. That an actual consultation with a lawyer is required before a putative client can develop a reasonable subjective belief in the relationship is reflected in the Florida Evidence Code's definition of a "client" as one "who consults a lawyer with the purpose of obtaining legal services or who is rendered services by a lawyer." Fla. Evid. Code § 90.502(1)(b) (emphasis added).

Florida case law illuminates the contours of the "subjective but reasonable belief" test for the existence of a lawyer-client relationship, and makes clear that the test is applicable only after a putative client has consulted with an attorney. Indeed, in Bartholomew, actual contact between an attorney and the putative client several times on a golf course, where "business in general" was discussed, was insufficient to establish the existence of an attorney client relationship. 611 So. 2d at 86-87. In spite of conversations that occurred between the lawyer and the putative client, the court said there was no attorney-client relationship where the lawyer's fellow golfer never actually consulted the attorney with the manifested intention of retaining him for legal services.

Also illustrative is The Florida Bar v. Beach, 675 So. 2d 106 (Fla. 1996). In Beach, the plaintiff contracted with a paralegal firm to prepare legal documents, which were to be reviewed by attorney Beach. Id. at 107. The contract stipulated that Beach would not represent the client unless she entered into a separate agreement with him. Id. The paralegal firm provided legal advice based on input from Beach, who never met or spoke with the client. Id. at 107-09. Where the client never actually communicated with or otherwise consulted the attorney, the Florida Supreme Court concluded that no attorney-client relationship ever existed. Id. The court reached this conclusion despite the fact that the putative client

testified that she considered Beach to be her attorney based on communications she received from the paralegal firm. Id. at 109 n.3. In the absence of even an informal consultation between the lawyer and the client, no attorney-client relationship was established, notwithstanding the putative client's subjective beliefs.

Beach makes clear that regardless of a putative client's subjective beliefs, there can be no attorney-client relationship when the client does not consult with the attorney, especially when there is no contact between them. An attorney-client relationship cannot be formed when the attorney has literally no basis to know that a putative client thinks the lawyer has been retained.[30] The most basic principles of equity and common sense dictate that it is not fair to charge lawyer X

---

[30]Jones emphasizes her subjective belief that Ruden McClosky was representing her, but she points to nothing that could even raise an inference that she "manifested" her intention to retain Ruden McClosky to the firm. See Bartholomew, 611 So. 2d at 86. Jones's interpretation of Florida's "subjective belief" test would render meaningless the "manifested intention" requirement, should we hold that requirement was met here, where the putative client's intention is never manifested to the attorney in question. We believe that giving effect to the requirement that a putative client manifest an intention to retain a lawyer is consonant both with Florida case law and with common sense, since otherwise the lawyer will have no reason to know of the client's subjective belief. The plain meaning of "manifest" is "to show plainly," and we believe that it is the lawyer being charged with representing a client who must have been plainly shown the client's intention to form the attorney-client relationship.

66

with representing client Y, where client Y has shown her intention to hire lawyer X to someone else but not to the lawyer himself.[31]

Because Jones has presented no evidence that she <u>ever</u> consulted Ruden McClosky, or even had any informal contact with the firm, we conclude that she has failed to raise a genuine issue of material fact concerning whether she formed an attorney-client relationship with Ruden McClosky.

We are also unpersuaded by Jones's argument that her receipt of a payment from the sanctions fund implies she was a Ruden McClosky client. As the district court explained:

> The issue of which claimants were entitled to a distribution of the sanction . . . was not litigated. Therefore, any determination made in the previous litigation does not have collateral estoppel effect in this case. Moreover, the fact that a party received monies from a sanction imposed by the Court for ethical violations should not have preclusive effect in a later private lawsuit for breach of a fiduciary duty. The standards for ethical breaches and imposition of civil liability for negligence are not the same.

<u>Jackson III</u> at 12. That various new claimants were allowed to share in the sanctions fund because it would be less expensive to do so than to litigate whether

---

[31] Our conclusion that Florida law requires the lawyer being charged with the attorney-client relationship to know or have reason to know that the putative client has sought to establish the relationship is echoed in Florida law on fiduciary relationships in other contexts. <u>See Capital Bank v. MVB, Inc.</u>, 644 So. 2d 515, 519 (Fla. Dist. Ct. App. 1994) (explaining that, in banking context, "a fiduciary relationship arises where the bank <u>knows or has reason to know</u> that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him." (internal quotation marks and citation omitted) (emphasis added)).

they should be allowed to do so compels neither the conclusion that these claimants had legitimate claims to the fund, nor that they were Ruden McClosky clients.

Finally, we remain unconvinced that a material issue of fact exists as to whether or not Jones was a third party beneficiary of the Ganz-Ruden McClosky association. For Jones to qualify as a third party beneficiary would require that the parties to the Ganz-Ruden McClosky agreement "intended to primarily and directly benefit" Jones. Tartell v. Chera, 668 So. 2d 1105, 1106 (Fla. Dist. Ct. App. 1996). A party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party. Caretta Trucking Inc. v. Cheoy Lee Shipyards Ltd., 647 So. 2d 1028 (Fla. Dist. Ct. App. 1994).

Jones can not, and does not suggest that the Fee and Workshare Agreement between Ganz and the Ruden McClosky defendants expressly reveals any intent to benefit her, since she is mentioned nowhere in that agreement (or in any other communications between the parties to the agreement). Rather, Jones argues that the collaboration of Ganz and Ruden McClosky was aimed at benefitting African-American employees of BellSouth who had suffered discrimination; that she was an African-American BellSouth employee who suffered discrimination; and

therefore that she was an intended beneficiary of the joint effort between Ganz and Ruden McClosky. If representing similar but unrelated BellSouth employees were not sufficient to prove that Ruden McClosky's legal services were designed to benefit her, Jones urges, she was a third party beneficiary because the firm represented her sister.

We find these overgeneralized syllogisms insufficient to defeat summary judgment. As described in the Fee and Workshare Agreement, the Ganz-Ruden McClosky collaboration was intended to serve a specific and clearly defined group of plaintiffs in the Adams lawsuit -- a group that, notably, did not include Jones. A lawyer's agreement to enter a lawyer-client relationship with a client or group of clients does not, somehow, automatically render that attorney counsel to other clients, no matter how closely related or similarly situated these others may be. See, e.g., JLF Enters., Inc. v. Malinski, 800 So. 2d 334, 335-36 (Fla. Dist. Ct. App. 2001) (finding that no attorney-client relationship existed between shareholders of corporation and lawyer who had previously represented corporation); Chaiken v. Lewis, 754 So. 2d 118, 118 (Fla. Dist. Ct. App. 2000) (finding that lawyer for partnership represented partnership entity, but did not thereby become counsel for each partner individually). Jones simply has failed to introduce any evidence

suggesting that she was a third-party beneficiary to the Ganz-Ruden McClosky collaboration.

Because we find that Jones failed to raise a genuine issue of material fact as to her alleged status as a client of Ruden McClosky, we agree with the district court's determination that the defendants did not owe any duty to Jones. The Ruden McClosky defendants could not owe Jones a duty since they never knew of her or her claims against BellSouth. Jones never contacted Ruden McClosky and never communicated her complaints to them. Moreover, the firm exercised due care in determining who their clients actually were and never learned anything about Jones's subjective belief that they represented her. Accordingly, we affirm the district court's entry of summary judgment for the Ruden McClosky defendants as to Jones's state law claims.

## IV.

In sum, we find none of the appellants' claims to be persuasive and therefore affirm the judgments of the district court in all respects.[32]

**AFFIRMED**.

---

[32]Our decision against the appellants can not be read to endorse in any way the substantial ethical lapses outlined by the district court in the Adams Omnibus Order. Quite the opposite is true. While the defendants' eagerness to resolve the Adams litigation is understandable, the disregard for the ethical rules they evinced in settling the underlying lawsuit was wrong and plainly must be condemned.