In re LENTEK INTERNATIONAL, INC., Debtor.

Michael Moecker, as Liquidating Trustee for Lentek International, Inc., Plaintiff,

v.

Greenspoon, Marder, Hirschfeld, Rafkin, Ross, Berger & Abrams Anton P.A., a Florida Professional Association, and Gregory Blodig, Individually, Defendants.

Michael Moecker, as Liquidating Trustee for Lentek International, Inc., Plaintiff,

v.

Greenspoon, Marder, Hirschfeld, Rafkin, Ross, Berger & Abrams Anton P.A., Defendant.

Bankruptcy No. 6:03–bk–08035–KSJ. Adversary Nos. 05–190, 05–81.

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Oct. 1, 2007.

Chad K. Alvaro, David M. Landis, Jon E. Kane, Mateer & Harbert PA, Orlando, FL, for Plaintiff.

Brian L. Wagner, Marshall Dennehey Warner Coleman & Goggi, Marty A. Stone, Greenspoon Marder, Victor S. Kline, Orlando, FL, for Defendants.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING WHETHER DEFENDANTS HAD AN ATTORNEY–CLIENT RELATIONSHIP WITH DEBTOR*

KAREN S. JENNEMANN, Bankruptcy Judge.

In these adversary proceedings asserting claims for malpractice and fraudulent transfer,[1] the sole issue is whether the defendants, a law firm, Greenspoon, Marder, Hirschfeld, Rafkin, Ross, Berger & Abrams Anton, P.A. ("Greenspoon Marder"), and one of its lawyers, Gregory J. Blodig ("Blodig"), ever established an attorney-client relationship with the corporate debtor, Lentek International, Inc. Greenspoon Marder certainly represented Lentek's president, Louis Lentine, in his purchase of Lentek's stock. The parties dispute, however, whether the law firm also represented Lentek, the corporation, in addition to representing Mr. Lentine, individually.

According to the plaintiff, Michael Moecker, as Lentek's liquidating trustee,[2] Lentine improperly used Lentek's assets to purchase shares of Lentek stock that Lentine later sold at a substantial profit.[3] The profits benefitted Lentine individually to the possible detriment of Lentek. If Greenspoon Marder represented Lentek in this transaction and Lentek was harmed, the law firm arguably is liable for Lentek's damages. However, Greenspoon Marder argues that no attorney-client relationship

---

1. On April 18, 2007, the Court entered an Order (Adv. Pro. 05–190, Doc. No. 131) Consolidating Adversary Proceeding Nos. 05–190 and 05–81 for the purpose of resolving the factual issue of whether the defendants represented Lentek. The plaintiff filed Adversary Proceeding 05–81 against Greenspoon Marder alleging that Lentek paid Greenspoon Marder for legal services rendered to Lentine, personally, and that Lentek received no corresponding value for these payments. Therefore, the plaintiff seeks to recover the transfers/payments pursuant to Bankruptcy Code Sections 548, 550, and Florida Statute Sections 726.105 and 726.106. In Adversary Proceeding 05–190, the plaintiff again sued Greenspoon Marder, and additionally, Blodig. In that Complaint, the plaintiff alleges the defendants breached fiduciary duties owing to Lentek and committed professional malpractice and are liable pursuant to Bankruptcy

Code Sections 541, 544, 548, 550, and Florida Statutes 726.105 and 726.106.

2. Michael Moecker was appointed as a liquidating trustee to gather assets for distribution to Lentek's creditors under the plan of reorganization confirmed by the Court on June 21, 2004 (Doc. No. 466). He has filed numerous adversary proceedings to collect assets in performance of his job, including these two related adversary proceedings.

3. Lentine allegedly financed his individual purchase of 225 shares of Lentek stock by using Lentek's assets. The sale price was approximately $2.4 million. Lentine later sold the same shares to RMS Limited Partnership ("RMS") for $5,000,000, resulting in profits to Lentine personally of $2.6 million, perhaps with no corresponding benefit to Lentek or its creditors.

ever existed between Lentek and the law firm. The Court agrees and concludes that the defendants never held an attorney-client relationship with Lentek, rather, they represented only Lentine and his interests, individually, during the stock transaction and at all other relevant times.

As a threshold matter, the parties disagree on the relevant legal standard to use in determining whether an attorney-client relationship exists under Florida law. Defendants' counsel, citing *Lombardo v. U.S.,* 222 F.Supp.2d 1367, 1385 (S.D.Fla.2002), *Gonzalez v. Chillura,* 892 So.2d 1075 (Fla.2d DCA 2004); *The Florida Bar v. Beach,* 675 So.2d 106 (Fla.1996); *Bartholomew v. Bartholomew,* 611 So.2d 85, 86 (Fla.2d DCA 1992); and *Jackson v. BellSouth Telecommunications,* 372 F.3d 1250, 1281–83 (11th Cir.2004) argues that the criteria for establishing an attorney-client relationship is limited to the putative client's subjective, reasonable beliefs and the client's manifestation, or absence of manifestation, of his or her intent to seek legal advice. Plaintiff's counsel, on the other hand, citing, most relevantly, *State v. Branham,* 952 So.2d 618, 620–21 (Fla.2d DCA 2007); *Keepsake Inc. v. P.S.I. Industries, Inc.,* 33 F.Supp.2d 1033 (M.D.Fla. 1999); *Blackhawk Tenn. Ltd. Partnership v. Waltemyer,* 900 F.Supp. 414 (M.D.Fla. 1995); and *In re Lawrence,* 217 B.R. 658, 664 (Bankr.S.D.Fla.1998), argues that the test is broader and disjunctive, and that an attorney-client relationship may be present either where: (i) a person consults with an attorney for the purpose of obtaining legal services, *or* (ii) an attorney has rendered legal services to a person.

Essentially, the plaintiff argues that merely performing legal services that may inure to the benefit of Lentek *alone* is enough to establish an attorney-client rela-

tionship, irrespective of the subjective intent of both the law firm, who never agreed to represent the debtor, and the principals of Lentek, who never sought to hire the law firm on behalf of the corporation. The difference between the two arguments is significant because both of the debtor's representatives with authority to hire an attorney for the debtor specifically testified that Greenspoon Marder did *not* represent the debtor and that they never asked the law firm to represent the debtor. Applying the defendants' version of the test would then end the inquiry because Lentek's representatives never hired the defendants on Lentek's behalf. Under the plaintiff's version of the test, however, the Court would be permitted to make a finding of an attorney-client relationship if it found that the defendants rendered legal services to the debtor, regardless of the subjective intent of either of Lentek's representatives. After a careful consideration of the relevant law, the Court concludes that the proper test for determining the existence of an attorney-client relationship is the test articulated by the defendants, and not the test advocated by the plaintiff, for the reasons explained below.

■ Florida law supplies and controls the legal standard applicable in this case for determining whether an attorney-client relationship is present. *The Florida Bar v. Beach,* 675 So.2d 106, 109 (Fla.1996) (*citing Bartholomew. v. Bartholomew,* 611 So.2d 85 (Fla.2d DCA 1992)). In a decision binding on this Court, *Jackson v. BellSouth Telecommunications,* 372 F.3d 1250, 1281–83 (11th Cir.2004), the Court of Appeals for the Eleventh Circuit articulated the test used by Florida courts "to determine whether a lawyer-client relationship exists in the absence of a formal retainer."[4] *Jackson,* 372 F.3d at 1281.

**4.** In this case, no retainer agreement was executed between Lentek and the defendants.

According to the Eleventh Circuit, the applicable test "is a subjective one and hinges upon the client's [reasonable] belief that he is *consulting* a lawyer in that capacity and his *manifested intention* is to seek professional legal advice." 372 F.3d at 1281 (*citing Bartholomew*, 611 So.2d at 86 (other citation and internal quotation marks omitted)). In a footnote, notably, the Eleventh Circuit Court stated that "[t]he subjective belief test is applied only *after* a putative client consults with an attorney, and is used to emphasize that, following a consultation, it is the belief of the putative client *and not the lawyer's actions* that determines whether a lawyer-client relationship has developed." *Jackson*, 372 F.3d at 1281, n. 29 (*citing Dean v. Dean*, 607 So.2d 494, 496–97 (Fla. 4th DCA 1992)) (second emphasis added). Thus, an actual consultation is a prerequisite to forming a reasonable belief supporting an attorney-client relationship. Post-consultation, the subjective, reasonable belief of the putative client is the paramount consideration in determining whether or not an attorney-client relationship is present, not the lawyer's actions.

Indeed, three of the cases cited by the plaintiff recite the very same test articulated by the Eleventh Circuit in *Jackson*. *See Blackhawk*,[5] 900 F.Supp. at 418 ("A legal relationship depends on the intent of the client,' not on the actions of the lawyer."); *Lawrence*,[6] 217 B.R. at 664 ("The

However, Plaintiff's Exhibit No. 5 is a letter, dated October 10, 2002, from the defendants and addressed to Lentine, as president of Lentek, confirming their retention. The letter starts with "Dear Lou," and then states "Thank you very much for retaining this firm *to assist you* in its present shareholder restructuring transactions." (emphasis added). Although not the most clearly worded sentence, the Court finds the letter was intended to reflect that Mr. Blodig and Greenspoon Marder represented Lentine, personally, not Lentek, in Lentine's efforts to buy the corporation's stock.

**5.** In *Blackhawk*, similar to this case, the defendant/attorneys sought a summary judgment that the plaintiff's malpractice allegations failed because no attorney-client relationship existed. The District Court for the Middle District of Florida denied the motion for summary judgment, concluding that the plaintiff/client's "*intent* that the Defendants provide [certain] legal services establishes a sufficient attorney-client relationship between the parties to allow Plaintiff[ ] to pursue a claim for legal malpractice" where the defendants failed "to establish that Plaintiff lacked this *intent*." 900 F.Supp. at 418. (emphasis added). Thus, summary judgment was denied because the defending attorneys could not prove an absence of intent. *Id.* In finding that a factual dispute existed concerning whether the defendants actually provided legal services to the plaintiff, the District Court refer-

enced the definition of "client" supplied in Section 90.502(1)(b) of the Florida Evidence Code. However, the Court did not conclude that Section 90.502(1)(b) of the Florida Evidence Code supplied the test for finding an attorney-client relationship. Rather, citing *Dean*, 607 So.2d 494, the District Court stated that the "legal relationship [between the parties] depends on the intent of the client,' not on the actions of the lawyer." 900 F.Supp. at 418. In *Blackhawk*, the critical fact was whether the plaintiff/client intended services to be rendered, not whether they were or were not, in fact, rendered.

**6.** In *In re Lawrence*, 217 B.R. 658, 664 (Bankr.S.D.Fla.1998), the Bankruptcy Court for the Southern District of Florida addressed whether a law firm had to be disqualified from representing a Chapter 7 trustee where the firm hired an attorney who had previously represented the debtor's mother. The court articulated a two pronged test for disqualification, which is not applicable here, and only tangentially addressed the test for demonstrating an attorney-client relationship, acknowledging that the test is "based in part upon the subjective belief [which must also be reasonable] that the client is being represented by the attorney." 217 B.R. at 664 (*citing Bartholomew*, 611 So.2d at 86). The court did not elaborate upon or detail additional factors for consideration in determining whether an attorney-client relationship was

test for determining whether the attorney-client relationship exists is based in part upon the subjective belief that the client is being represented by an attorney. However, this belief must be a reasonable one."); *Keepsake,* 33 F.Supp.2d at 1036 (In Florida, the existence of an attorney-client relationship hinges "upon the client's reasonable subjective belief that he is consulting a lawyer in that capacity with the intention of seeking professional legal advice.").

■ Not one case cited by the plaintiff actually holds that a law firm performing legal work *alone* and irrespective of a client's subjective intent is sufficient to establish an attorney-client relationship. Rather, the plaintiff supports his argument relying on the definition of "client" contained in Section 90.502 of the Florida Evidence Code, titled "Lawyer-client privilege." Section 90.502(1)(b) of the Florida Evidence Code, intended to assist parties and the courts in determining when an attorney properly may claim an attorney-client privilege against testifying, defines a "client" as "any person, public officer, corporation, association, or other organization or entity, either public or private, who consults a lawyer with the purpose of obtaining legal services *or who is rendered legal services by a lawyer.*" (emphasis added). Here, the plaintiff argues that, based on the evidence, the Court can conclude that the defendants performed legal services for Lentek. As such, they "rendered legal services," and the Court should find they established an attorney-client relationship with Lentek, regardless of Lentek's representatives' lack of intent to hire Greenspoon Marder on Lentek's behalf.

The Court rejects this argument finding that the definition of a "client" supplied in

Florida Statute Section 90.502 pertains specifically to the proper use of the attorney-client privilege and does not articulate the test for determining whether an attorney-client relationship exists under the law of Florida and the Eleventh Circuit. Indeed, Section 90.502, by its own limiting language, states that the test was for the purpose of that particular section only. As such, Section 90–502 does not control, nor should it.

■ The proper test to use in determining whether an attorney-client relationship was formed is whether the putative client formed a reasonable, subjective belief that an attorney-client relationship existed. How can a client hire a lawyer if the requisite intent is lacking' Certainly, whether or not an attorney actually rendered legal services can be considered in connection with whether or not a putative client's subjective belief is reasonable. Following a consultation, and in the absence of an executed retainer agreement, if no services were performed by the attorney, the putative client's argument that an attorney-client relationship existed may seem less reasonable. Conversely, applying the same scenario where no retainer exists following a consultation, if an attorney does render legal services and the services span a significant period of time, a client's subjective belief that he or she was represented by that attorney may be quite reasonable. Thus, although the fact that an attorney renders legal services may carry some weight as a factor in assessing the reasonableness of a person's subjective belief, it does not conclusively establish the existence of an attorney-client relationship. The issue, therefore, as stated by the Eleventh Circuit Court of Appeals, is whether

present. The attorney-client relationship was discussed only because it constituted one of

the two prongs of the test for disqualification.

Lentek held a "subjective but reasonable belief" that Blodig and Greenspoon Marder represented it.

In this case, assessing the reasonableness of a client's belief is complicated by the fact that the putative client is a corporation, Lentek, controlled by two principals, Lentine and Joseph Durek, and by the fact that the disputed transaction involved Lentine's purchase of Durek's stock in order to gain control of Lentek's operations. Certainly, the nature of these transfers among insiders obfuscates the issue.

Prior to October 2002, Lentine and Durek shared control of Lentek. Both were the sole officers and substantial shareholders of the corporation each owning 45 percent of the corporate shares. In September 2002, the relationship between the insiders had deteriorated to the point that Durek was willing to sell his Lentek shares to Lentine and, from that point onwards, to allow Lentine to manage the business. The shareholders agreed to the basic terms of a stock transfer on September 16, 2002. (Plaintiff's Ex. No. 3).

Both gentlemen then hired lawyers. Durek hired Steven Lee of the Dean, Mead, Egerton, Capouano & Bozarth, P.A. law firm. Lentine hired Greg Blodig with Greenspoon Marder. (Plaintiff's Ex. No. 5).

Mr. Lee maintained the corporate records of Lentek and drafted the necessary corporate resolutions as well as the initial version of the documents related to the stock transfer. Mr. Blodig then reviewed the proposed drafts and made responsive comments on behalf of Lentine. (Plaintiff's Ex. Nos. 14 to 19). Most of the comments focused on the Stock Purchase Agreement, which was the primary document executed by both Lentine and Durek. (Plaintiff's Ex. No. 19). However, Blodig's comments also address three related agreements—a Non–Solicitation Agreement, a Consulting Agreement, and a Representation Agreement, each initially drafted by Durek's lawyer. (Plaintiff's Ex. Nos. 20–22).

These related agreements were solely between Durek and Lentek. Lentine signed them only in his capacity as President of Lentek. The related agreements promised Durek certain continuing financial benefits and incentives after he sold his stock to Lentine.[7] Lentek was primarily liable for performing these obligations; however, Lentine also remained individually liable pursuant to his agreement to indemnify Durek for any breach by Lentek.

The plaintiff asserts that Blodig's editorial comments on the related agreements constituted legal work rendered by the defendants on behalf of Lentek. Given Lentine's continuing financial obligations for these corporate obligations to Durek, however, it appears more likely that Blodig was simply protecting Lentine, rather than protecting Lentek. Nothing in the evidence indicated that Blodig ever famil-

---

**7.** The Stock Purchase Agreement also imposed substantial obligations upon Lentek and, by its own terms, was "duly and validly executed and delivered by the Purchaser [Lentine] and the Corporation [Lentek] and constitutes the legal, valid and binding obligation of the Purchaser and the Corporation, enforceable in accordance with its terms." (Plaintiff's Ex. No. 19, p. 5, ¶ 5(b)). Among other things, the Stock Purchase Agreement specified that Lentek would pay Durek's health insurance for 18 months following the closing of the Agreement (p. 8, ¶ 7(e)), that Lentek would purchase a van owned by Durek and would assume the debt on the van (p. 8, ¶ 7(f)), that Lentek would transfer to Durek the office and computer equipment in Durek's office as additional compensation to Durek (p. 8, ¶ 7(g)), and that Durek would be repaid the sum of $80,492.96 he had earlier loaned to Lentek (p. 9, ¶ 7(h)).

iarized himself with Lentek's financial structure or i n any way evaluated the impact this stock transfer would have on Lentek's operations. He did not act as if he represented the corporation in the stock transfer.

Moreover, the only two people able to hire lawyers on behalf of Lentek, Durek and Lentine, did not believe Blodig represented Lentek. The testimony of both Lentine and Durek on this point was consistent and clear. Lentine hired Blodig to represent his individual interests, not the interests of Lentek. Similarly, Durek testified that he hired Lee to represent his individual interests, not Lentek's interests. As the sole officers of Lentek, neither gentleman thought to hire separate legal representation for the company in this stock transfer, although Lentek likely needed separate counsel; neither gentleman had any reasonable, subjective belief that Blodig or Greenspoon Marder represented Lentek at any time in the transaction. Although these men may have breached their fiduciary duty in failing to get proper counsel for the company, the evidence is unrebutted that neither man hired a lawyer to represent Lentek. Certainly neither of them hired Greenspoon Marder or Mr. Blodig to represent Lentek.

In an attempt to demonstrate that the defendants represented Lentek, the plaintiff called two witnesses, Steven Lee, Durek's attorney, and Randa King, the former controller for Lentek, both of whom testified that they believed, for different reasons, that the defendants *did* represent Lentek in the stock transfer. With all due respect for these witnesses, their testimony regarding whether the defendants represented Lentek was irrelevant, as argued by the defendants at trial. Neither Lee nor King possessed any ability or authority to hire counsel for Lentek or to speak

for Lentek. Notwithstanding, their testimony is summarized below.

Lee was retained by Durek to represent Durek individually in connection with Lentine's purchase of Durek's stock. (Plaintiff's Ex. No. 1, retainer agreement specifying Lee/Dean Mead represented Durek, individually; Plaintiff's Ex. No. 2, check to Dean Mead drawn on Durek's personal SunTrust account). Lee testified that he personally believed that Blodig/Greenspoon Marder represented Lentek based on Blodig's comments to the agreements related to the Stock Purchase Agreement signed only by Lentek, not Lentine in his individual capacity, and because Blodig was required to receive notice if Lentek defaulted in its obligations under the Stock Purchase Agreement. However, at no time did Lee have a conversation that would confirm his understanding that Blodig represented Lentek. Moreover, assuming Blodig indeed did hold himself out as a lawyer for Lentek, Lee's perception, even if accurate, is simply irrelevant. It is the subjective intent of the client, here either Lentine or Durek, which counts, not the opinion of Durek's lawyer.

Similarly, Ms. King's testimony as a former controller of Lentek is irrelevant. She was first employed at Lentek via a temporary agency in January, 2004, almost two years *after* the stock transfer occurred. She was permanently employed by Lentek in May 2004, in part to reconcile the company's 2002 financial data and to assist in preparing Lentek for an audit. During the course of her work, she came across $1.2 million in unclassified financial entries occurring in 2002, some of which were attributable to bills for legal services rendered by the defendants in connection with the stock transfer. Without dispute, Lentek paid for all of Lentine's individual legal expenses relating to the stock transfer. (Plaintiff's Ex. Nos. 6, 7, 8, 9 and 10).

However, the company had not allocated those expenses prior to King's work in preparing for the upcoming audit. She merely reclassified these bills as corporate legal expenses for accounting purposes. Lentine never advised her that the expenses were for legal services rendered to him, personally, and not the company. Nor did Lentine tell King that she should issue a 1099 Form to him personally so that he could properly report the income for his own individual federal income tax purposes. The Court suspects that Lentine likely was trying to avoid these federal tax consequences. King merely was making a reasonable assumption that, because Lentek paid a lawyer, the legal services rendered were for the company. She had no personal knowledge either way, and, as such, her testimony is irrelevant.

As a final argument, the plaintiff argues that, at the very least, the defendants should be judicially estopped from denying that they represented Lentek in connection with the stock transaction because of the answers to interrogatories (Plaintiff's Ex. No. 24) Greenspoon Marder signed i n Adversary Proceeding 05–81, in which the plaintiff alleged Greenspoon Marder received actually or constructively fraudulent transfers when it accepted Lentek's payments for legal services rendered to Lentine individually. The issue whether Greenspoon Marder provided a reasonably equivalent value, or any value, to the debtor for the payments it received from Lentek will be addressed in the context of the plaintiff's fraudulent transfer claims in that separate adversary proceeding. Here, however, on the issue of attorney-client representation, the only relevant issue is whether the defendants' interrogatory answers should judicially estop them from denying that they represented Lentek. Specifically, Interrogatory Number 6 asks:

Identify each person with any knowledge of the facts relevant to the issues in this adversary proceeding or to any Transfers and provide a general description of the facts and/or subject matter known by each such person.

In their Answer to Interrogatory Number 6, the defendants stated:

Mr. Marder, Mr. Blodig, and Mr. Nordt rendered legal services which directly or indirectly benefited Lentek International, Inc.

Multiple other interrogatories (for example, Interrogatory Numbers 7, 8, 9, and 10) from the plaintiff directed the defendants to state why the transfers were not actually or constructively fraudulent under the Bankruptcy Code and Florida law. In response to those interrogatories, the defendants stated:

"Lentek International, Inc., made payments to Greenspoon Marder who took the payments in good faith for legal services which directly or indirectly benefited Lentek International, Inc. Thus, there was no actual intent to hinder, delay, or defraud Lentek's creditors. Lentek did not receive less than a reasonably equivalent value in exchange for payment of GM's fees. Thus, there were no damages to Lentek International Inc.'s creditors as a result of its payment of attorney's fees to Greenspoon Marder. Moreover, pursuant to Lentek International, Inc.'s Amended and Restated By Laws adopted April, 2003, Lentek International, Inc., agreed to indemnify any officer or director, including Lou Lentine, or any former officer or director, to the full extent permitted by law. All documents responsive to this Interrogatory have been produced herewith in lieu of identifying the documents."

The Eleventh Circuit Court of Appeals discussed judicial estoppel in *Par-*

ker v. Wendy's Intern'l, Inc., 365 F.3d 1268 (11th Cir.2004) [8] and in *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282 (11th Cir.2002). "Judicial estoppel is an equitable doctrine invoked at a court's discretion" that precludes a party from asserting inconsistent claims in legal proceedings. *Burnes*, 291 F.3d at 1285–86 (*citing New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). Courts can invoke the doctrine "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions." *Burnes*, 291 at 1285–87 (*citing New Hampshire*, 532 U.S. at 749–50, 121 S.Ct. 1808; *American Nat'l Bank of Jacksonville v. Federal Dep. Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir.1983) ("judicial estoppel applies to the calculated assertion' of divergent positions")). The doctrine should not be invoked when the prior position was a result of inadvertence or good faith mistake. *Burnes*, 291 F.3d at 1285–87 (citations omitted).

While not an exact science, courts in the Eleventh Circuit generally consider two factors in determining whether to apply judicial estoppel to a particular case. *Parker*, 365 F.3d at 1271 (*citing New Hampshire*, 532 U.S. at 750, 121 S.Ct. 1808); *Burnes*, 291 F.3d at 1285 (*citing Salomon Smith Barney, Inc. v. Harvey, M.D.*, 260 F.3d 1302, 1308 (11 th Cir. 2001)). "First, it must be shown that the allegedly inconsistent positions were made under oath i n a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Burnes*, 291 F.3d at 1285–86 (*citing Salomon*, 260 F.3d at

1308). These factors do not represent an exhaustive list. Instead, courts must consider all circumstances when determining whether to apply judicial estoppel. *Burnes*, 291 F.3d at 1286; *New Hampshire*, 532 U.S. at 750–51, 121 S.Ct. at 1815 (Noting that courts typically consider: (1) whether the present position is "clearly inconsistent" with the earlier position; (2) whether the party succeeded in persuading a tribunal to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding creates the perception that either court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage on the opposing party).

Judicial estoppel is not appropriate here. The defendants have not asserted divergent or inconsistent positions in the two adversary proceedings such as would make a mockery of the judicial system. Although the defendants stated that they accepted the payments "in good faith for legal services which directly or indirectly benefited Lentek," this is not equivalent to stating that they did, in fact, represent Lentek. Rather, they simply stated that value was rendered in exchange for the payments they received. I n addition, this Court has not accepted or relied on the defendants' assertion that Lentek received value for the exchange in any way. An example of where judicial estoppel *may* be appropriate in the context of the two adversary proceedings here is if, following this ruling, Greenspoon Marder changed its position and attempted to claim they *did* represent Lentek and, as a result,

---

**8.** In *Parker,* the Eleventh Circuit Court of Appeals declined to invoke the doctrine to preclude a Chapter 7 trustee from pursuing an employment discrimination claim that the debtor initially failed to disclose as an asset on her bankruptcy schedules. 365 F.3d at 1269. The Court ruled that the claim was an asset of the debtor's bankruptcy estate and that the trustee, as the real party in interest, should not be estopped from pursuing the claim since the trustee had not asserted divergent or inconsistent positions in any legal proceedings.

Lentek received something of value by way of their legal services. However, that is not what Greenspoon Marder has done to date. They merely have stated in interrogatory answers that Lentek "directly or indirectly" received some benefit from their services. This statement is not tantamount to professing that they represented Lentek in the stock transfer, and the Court finds no inconsistent position and certainly no statement calculated to make a mockery of the judicial system.

The test to determine whether the defendants represented Lentek is whether Lentek, through its authorized officers, Durek and Lentine, held a subjective, reasonable belief that the company hired the law firm. The unrebutted evidence is that neither man hired the defendants and that no attorney-client relationship was established between the defendants and Lentek. The facts that some of the defendants' legal work pertained to Lentek, that the officers were focused on their own self-interest, and not on Lentek's interests, or that other third parties, such as Lee or King, believed the defendants represented Lentek, are irrelevant. Lentek had no attorney-client relationship with Greenspoon Marder or Mr. Blodig.

A status conference is scheduled for **October 25, 2007, at 10:00 a.m.** At that time, the parties can present their positions on the remaining actions needed to resolve these two related adversary proceedings i n light of this ruling. A separate order consistent with these findings of fact and conclusions of law shall be entered.